ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

FILED
FEB 22 2008
U.S. COURT OF FEDERAL CLAIMS

L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 08-101 C

**MEMORANDUM IN SUPPORT OF L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Ronald K. Henry
KAYE SCHOLER LLP
901 Fifteenth Street, N.W.
Washington, D.C. 20005-2327
(202) 682-3500 telephone
(202) 682-3580 facsimile
rhenry@kayescholer.com

Date: February 22, 2008

*Attorney for L-3 Global Communications Solutions, Inc.*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... II

PRELIMINARY STATEMENT ..... 1

STATEMENT OF THE FACTS ..... 2

A. The Solicitation ..... 2

B. The Evaluation and Award ..... 4

ARGUMENT ..... 6

I. LEGAL STANDARDS GOVERNING PRELIMINARY INJUNCTIVE RELIEF ..... 6

II. L-3 GCS IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS ..... 7

A. ADCI's Proposal Was Technically Unacceptable and Therefore Ineligible for Contract Award ..... 8

B. The Coast Guard Conducted a Defective Evaluation of ADCI's Proposal ..... 10

C. The Coast Guard Failed to Follow the Requirements Set Forth in the RFQ and Improperly Waived Mandatory Requirements for the Benefit of ADCI ..... 11

D. The Coast Guard Failed to Treat Offerors Equally ..... 12

III. L-3 GCS WILL SUFFER IRREPARABLE HARM IF PRELIMINARY INJUNCTIVE RELIEF IS DENIED ..... 14

IV. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF GRANTING L-3 GCS'S MOTION FOR PRELIMINARY INJUNCTION ..... 15

A. The Government Will Suffer No Harm If The Court Enters A Preliminary Injunction ..... 16

B. The Potential Harm To ADCI If The Court Enters A Preliminary Injunction Is, At Most, Minimal ..... 17

V. PRELIMINARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST ..... 17

CONCLUSION ..... 19

# TABLE OF AUTHORITIES

## CASES

*Advanced Sys. Tech., Inc. v. United States*,
69 Fed. Cl. 474 (2006) ........ 7, 15, 17, 18

*Asia Pac. Airlines v. United States*,
68 Fed. Cl. 8 (Ct. Cl. 2005) ........ 19

*Chrysler Motors Corp v. Auto Body Panels, Inc.*
908 F.2d 951 (Fed. Cir. 1990) ........ 7

*FMC Corp v. United States*,
3 F.3d 424 (Fed. Cir. 1993) ........ 6

*Great Lakes Dredge & Dock Co. v. United States*,
60 Fed. Cl. 350 (2004) ........ 17

*Heartland Acad. Cmty. Church v. Waddle*,
335 F.3d 684 (8th Cir. 2003) ........ 7

*Hospital Klean of Texas, Inc. v. United States*,
65 Fed. Cl. 618 (2005) ........ 15

*In re Universal Yacht Services, Inc*,
2001 WL 360402 ........ 10

*Isratex, Inc. v. United States*,
25 Cl. Ct. 223 (1992) ........ 18

*JWK v. United States*,
52 Fed. Cl. 650 (2002) ........ 13

*Labat-Anderson Inc. v. United States*,
50 Fed. Cl. 99 (2001) ........ 18

*Magellan Corp. v. United States*,
27 Fed. Cl. 446 (1993) ........ 7

*Mangi Environmental Group, Inc. v. United States*,
No. 00-29C (Fed. Cl. 2000) ........ 11

*Mikohn Gaming Corp. v. Acres Gaming*,
165 F.3d 891 (Fed. Cir. 1998) ........ 7, 8

*Naplesyacht.com, Inc. v. United States*,
No. 04-252C, 16 (Fed. Cl. 2004) ........ 11, 13, 14

*OTI Am, Inc. v. United States*, 68 Fed. Cl. 646 (2005) .......... 15

*Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728 (2000) .......... 19

*PGBA L.L.C. v. United States*, 57 Fed. Cl. 655 (2003) .......... 19

*Planning Research Corp. v. United States*, 971 F.2d 736 (Fed. Cir. 1992) .......... 9, 10

*Prot. Strategies Inc. v. United States*, 76 Fed. Cl. 225 (2007) .......... 9

*Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705 (2006) .......... 16

*Seems Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970) .......... 15

*TLT Construction Corp. v. United States*, 50 Fed. Cl. 212 (2001) .......... 13

*TRW Envtl. Sys. Inc. v. United States*, 16 C. Ct. 520 (1989) .......... 15

*Unified Architecture & Eng'g v. United States*, 46 Fed. Cl. 56 (2000) .......... 9

**STATUTES**

28 U.S.C. § 1491(b) .......... 6

5 U.S.C. § 706(2)(A) .......... 7

**RULES**

Rule 65 of the Court of Federal Claims .......... 6

**REGULATIONS**

FAR § 8.405-2(d) .......... 14

Plaintiff L-3 Global Communications Solutions, Inc. ("L-3 GCS"), by its attorneys, is moving pursuant to Rule 65(a) of the Rules of the United States Court of Federal Claims for a preliminary injunction enjoining Defendant, the United States of America (the "Government"), acting by and through the U.S. Department of Homeland Security, United States Coast Guard Office of Contract Support, General Contract Division, G-ACS-2 ("Coast Guard" or "Agency") from allowing ADCI of Delaware, LLC ("ADCI") to begin or continue performance under a contract (the "Contract") awarded pursuant to Request for Quotation No. HSCG23-08-Q-TMM001 ("RFQ" or "Solicitation").

## PRELIMINARY STATEMENT

This case is relatively straightforward. The contract award at issue involves the provision of satellite airtime services to the Coast Guard. Because STRATOS is the only airtime services Land Earth Station Operator ("LESO") provider configured to be compatible with both the Coast Guard's Fleet-55 terminals and data network, the Solicitation required that all proposals exclusively offer STRATOS as the airtime services provider. Plaintiff L-3 GCS's proposal was technically acceptable because, among other things, it offered to use only STRATOS airtime services. In contrast, ADCI failed to offer exclusively STRATOS airtime services.

The failure of ADCI to conform to the Solicitation's mandatory and material requirements made ADCI's proposal technically unacceptable, and ineligible for contract award. However, the Coast Guard awarded the Contract to ADCI. Because ADCI received the award despite being a non-compliant and technically unacceptable offeror, the Coast Guard conducted a defective evaluation, failed to follow the RFQ's requirements and failed to treat the offerors equally. Accordingly, the Coast Guard's evaluation of ADCI's proposal was arbitrary, capricious, inconsistent with the terms of the Solicitation and contrary to law and regulation.

L-3 GCS has no adequate remedy in law and will suffer irreparable injury if an injunction is not entered. If the requested preliminary injunction is not granted, L-3 GCS will be substantially prejudiced because it will have been denied an opportunity to fairly compete for the

award and will suffer the loss of significant revenues and potential profits. If ADCI is permitted to utilize an airtime services provider other than STRATOS, but L-3 GCS is later awarded the Contract, the Government will have to incur significant effort and expense to repeatedly reconfigure its network. Furthermore, the public interest will be harmed if injunctive relief is not granted because the Government will be disrupted by having to rely on ADCI's technically unacceptable and noncompliant solution. The public interest will also be harmed by the risks inherent with an untested, incompatible communications system, as well as by the fact that the award to ADCI compromises the procurement process.

In contrast, if the requested injunctive relief is granted, the Government will not suffer any harm because it will leave L-3 GCS in place to perform the services it has successfully performed to date as the incumbent contractor. In addition, the Coast Guard has already delayed performance of a significant portion of the Contract for more than 60 days because of the problems with ADCI's implementation of the Solicitation's requirements. Similarly, any harm to ADCI will be minimal at best because it has failed to offer a solution that conforms to the Solicitation, and, in any event, has yet to begin performance on the majority of the Contract.

As demonstrated herein, L-3 GCS's likelihood to prevail on the merits, the irreparable injury that L-3 GCS will suffer, the balance of the hardships and the impact on the public interest all weigh heavily in favor of granting the preliminary injunction. Therefore, this Court should grant preliminary injunctive relief to preserve the status quo and allow it the opportunity to consider the merits of this case.

## STATEMENT OF THE FACTS

### A. The Solicitation

L-3 GCS was established in 1995 as a supplier of satellite communications products, airtime services and turnkey systems solutions to U.S. and international military, government, industrial and commercial accounts. L-3 GCS presently has approximately 100 employees operating from its headquarters in Rochester, New York, and several sales locations across the United States. As a key provider of International Maritime Satellite ("INMARSAT") airtime, over

the last 18 months L-3 GCS has managed more than six million airtime minutes for the Department of Defense, Federal/Civil Agencies, and Emergency Response and Commercial Customers, making L-3 GCS one of the largest providers of INMARSAT services in the world. L-3 GCS is also an incumbent of the predecessor contract for INMARSAT satellite airtime services to the Coast Guard.

On October 22, 2007, the Coast Guard issued Request for Quotation No. HSCG23-08-Q-TMM001, which sought to continue existing satellite airtime services for the Coast Guard's INMARSAT Mini-M and Fleet series terminals under the General Services Administration ("GSA") Federal Supply Schedule ("FSS") 70 Contract. *See* Exhibit 1, RFQ at 1. In describing the bid evaluation process, the RFQ stated that "[t]he Government will evaluate your quote, and make a BPA award to the responsible vendor deemed technically acceptable with the lowest quoted price determined to be fair and reasonable." *See* Exhibit 1, RFQ at 1-2. The RFQ also required "[a] statement of compliance that the contract can meet all the services prescribed in this RFQ." *See* Exhibit 1, RFQ, at 1. The RFQ Statement of Work ("SOW"), paragraph 1.5, stated "this is a Blanket Purchase Agreement (BPA), there will be a five (5) year ordering period from 1 November 2007 to 31 October 2012, unless the BPA ceiling has been reached first." *See* Exhibit 1, Attachment 1, SOW, at 2.

Because STRATOS is the only commercial airtime service provider configured to be compatible with both the Coast Guard's Fleet-55 (including shipboard) terminals and the Coast Guard's data network, the Coast Guard solicitation required that all proposals offer only STRATOS as the Land Earth Station Operator ("LESO"). On or about October 25, 2007, in response to bidder's questions, the Coast Guard posted responses to questions on GSA's "eBuy," a public website which all potential offerors could review. *See* Exhibit 2, Question Set 2. Question Set #2, Question #3, asked, "Given that the MDPS and ISDN traffic is terminated terrestrial using the existing LESO, we assume that it is mandatory that we use the same LESO for that requirement. If so, please state who that LESO is." The Coast Guard posted a single-word response to this question: "STRATOS." *Id.*

The RFQ initially required bidders to submit a quotation to the Purchasing Agent "on or before 10:30 AM, EDT, on 29 October 2007." *See* Exhibit 1, RFQ, at 2. This deadline was subsequently extended to 2 November, 2007. On November 2, 2007, L-3 GCS submitted a timely proposal in response to the RFQ. In its proposal, L-3 GCS designated STRATOS as its only airtime services provider.

**B. The Evaluation and Award**

By letter dated December 3, 2007, the Coast Guard advised L-3 GCS that "[i]n accordance with Federal Acquisition regulation (FAR) Subpart 8.4 'Federal Supply Schedules,' a 'Lowest Price, Technically Acceptable' (LPTA) blanket purchase agreement (BPA) under GSA 70. . . has been awarded to ADCI of Delaware, LLC, 5550 Friendship Blvd., Suite 340, Chevy Chase, MD, 20815-7227 with a BPA ceiling in the amount of $28,940,576.25." *See* Exhibit 3, Post-Award Notification.

On December 20, 2007, the Coast Guard Contracting Officer and Purchasing Agent telephonically debriefed L-3 GCS. Exhibit 4, Declaration of Jeff Myers ("Myers Decl.") ¶ 7. At that time, the Coast Guard asserted that all offers received by the Coast Guard were technically acceptable, and that the award was therefore made on the basis of price alone. The Coast Guard also asserted that L-3 GCS was not selected for the award because its price was higher than that of ADCI.

During the debriefing, L-3 GCS requested the Coast Guard to verify that the other proposals also offered STRATOS as the exclusive airtime services provider, in accordance with the Coast Guard's solicitation requirements. The Coast Guard reaffirmed that the solicitation clearly designated STRATOS as the only acceptable airtime services provider, and that all offerors, including ADCI, had complied with this requirement. The Coast Guard further stated that ADCI, the successful offeror, had submitted a proposal that specified STRATOS would be the sole and exclusive airtime services provider for the full five-year effective period of the awarded contract.

During the debriefing, L-3 GCS explained that this requirement was an extremely important consideration given the fact that the use of another airtime provider could enable the offeror of an alternative airtime provider to submit a lower priced proposal but that such a proposal would not meet the Coast Guard's needs. The Coast Guard responded that, for very compelling practical reasons, no other airtime services provider could be because the Coast Guard communication network is configured in such a way that the use of any airtime service provider other than STRATOS would force the Coast Guard to undertake a wholesale, prohibitively expensive reconfiguration of their network.

The Coast Guard closed the debriefing by stating that if L-3 GCS learned that arrangements have been or are being made to substitute a non-STRATOS service provider, L-3 GCS should report the occurrence to the Coast Guard Contracting Office, which would act to prevent such a bait and switch substitution.

Because of the award to ADCI and the assurances received during the debriefing that ADCI's proposal utilized only STRATOS, L-3 GCS believed that the services it was providing under the predecessor contract would be transitioned to ADCI in the month of January 2008. Instead, by the end of January 2008, none of the Fleet-55 terminals being serviced by L-3 GCS had been transitioned to ADCI. To date, L-3 GCS continues to provide airtime services to all of the Coast Guard's Fleet-55 terminals. Further, on January 31, 2008, the Coast Guard advised L-3 GCS that a Fleet-55 terminal that is to be installed on the new Coast Guard Cutter "Ocracoke" will be activated under the L-3 GCS predecessor contract rather than under the contract awarded to ADCI. These events caused L-3 GCS to begin inquiries in an attempt to discover why the expected transition had not occurred.

On February 7, 2008, L-3 GCS's personnel attempted to contact the Coast Guard Contracting Officer regarding the anticipated switchover from L-3 GCS to ADCI. A Coast Guard communications specialist in TISCOM informed L-3 GCS that ADCI had proposed an unacceptable technical solution which the evaluation team must have overlooked. Rather than utilizing STRATOS as the exclusive airtime services provider under the Contract, as required by

the RFQ, ADCI's proposal had actually been based on the use of Telemar Italia (ADCI's foreign parent) as its airtime services provider. This non-compliant and technically unacceptable proposal prevented the Coast Guard's Fleet-55 terminals from being able to communicate with the Coast Guard data network.

ADCI's use of an airtime services provider other than STRATOS was exactly what L-3 GCS had challenged during its debriefing, and was exactly what the Coast Guard had promised would not occur. L-3 GCS subsequently attempted to reach the Contracting Officer on numerous occasions to confirm whether the contract awarded to ADCI was being terminated. To date, L-3 GCS has not been able to obtain confirmation that the contract awarded to ADCI is being terminated and, therefore, L-3 GCS reluctantly brings the instant action.

## ARGUMENT

### I. LEGAL STANDARDS GOVERNING PRELIMINARY INJUNCTIVE RELIEF

This Court has authority to issue a preliminary injunction in an action alleging improprieties in an award of a contract by a government agency under 28 U.S.C. § 1491(b) and Rule 65 of the Rules of the Court of Federal Claims. In deciding whether to enter a preliminary injunction, the Court considers four factors: (1) the threat of irreparable injury to the moving party; (2) the balance between this harm and the injury (if any) that granting the injunction might inflict on the government or third parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest. *See, e.g., FMC Corp v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). None of these individual factors is determinative standing alone, and, in fact, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *Chrysler Motors Corp v. Auto Body Panels, Inc.* 908 F.2d 951, 953 (Fed. Cir. 1990). When, as in this case, the moving party seeks to preserve the status quo, the burden for seeking a preliminary

injunction is lessened. *See Mikohn Gaming Corp. v. Acres Gaming*, 165 F.3d 891, 896 (Fed. Cir. 1998).

## II. L-3 GCS IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS

"In considering whether to grant interim injunctive relief pending a final decision on the merits, this Court has recognized that likelihood of success is a flexible factor." *Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 483 (2006); *see also Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993) (finding that "it is not fatal to [plaintiff's] effort to obtain interim relief, for example, that it cannot demonstrate a 'significant' or 'strong' likelihood of success"). Indeed, the moving party is "not required to prove a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003).

In accordance with the Administrative Procedure Act, the Court is required to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, the Coast Guard conducted an improper evaluation that erroneously rated ADCI's technically unacceptable proposal as technically acceptable, making the contract award inconsistent with the terms of the RFQ and contrary to law. In the absence of these prejudicial errors, the Contract would have been awarded to L-3 GCS as the offeror representing the best value to the Government. Because both the balance of hardships and the public interest weigh in L-3 GCS's favor, a preliminary injunction should be granted as long as L-3 GCS has "a fair chance" of prevailing on the merits. *Mikohn Gaming Corp.*, 165 F.3d at 895. The standard for issuing a preliminary injunction is more than satisfied here.

### A. ADCI's Proposal Was Technically Unacceptable and Therefore Ineligible for Contract Award

The RFQ required that the Contract be awarded to the offeror with the "Lowest Price, Technically Acceptable" proposal. ADCI's proposal was non-compliant and technically unacceptable because it failed to comply with three material requirements of the Solicitation: (1) designating STRATOS as the exclusive airtime services provider; (2) providing an accurate certification of compliance with the Solicitation; and (3) offering the required performance (including STRATOS) promptly at time of contract award.

First, the RFQ required STRATOS as the sole and exclusive airtime services provider for the full five-year effective period of the Contract. In fact, prior to the contract award, the Coast Guard provided a "Question & Answer" (Q&A) on the GSA's public "eBuy" website, which related to this requirement.[1] In its Q&As, the Coast Guard stated that "STRATOS" was the mandatory LESO for the MPDS and ISDN traffic, which includes the Fleet-55 terminals. *See* Exhibit 2, Question Set #2, Question #3. During L-3 GCS's debriefing, the Coast Guard reaffirmed that the Solicitation clearly designated STRATOS as the only acceptable satellite airtime services provider. Exhibit 4, Myers Decl. ¶ 11-12. At the same time, the Coast Guard explained that, for very compelling practical reasons, they could not accept any other airtime services provider because their communication network is configured in such a way that the use of any provider other than STRATOS would force the Coast Guard to undertake a wholesale, prohibitively expensive configuration of their network.

Despite these requirements, ADCI failed to offer STRATOS as its exclusive provider of airtime services. ADCI either intentionally misled the Coast Guard by initially representing that it intended to provide exclusive STRATOS airtime services and, thereafter, conducting a "bait and switch," or failed to realize that the Solicitation required the exclusive use of STRATOS airtime services. "The crux of a bait and switch claim is the government's reliance on a misrepresentation by a successful bidder, which effectively changes the term or terms of the underlying solicitation."

[1] Because Q&As serve as amendments to the RFQ, and are readily available to all potential offerors, they are an integral part of the solicitation. *Datastream Systems, Inc.*, B-291653, Jan. 24, 2003, 2003 CPD ¶30 at 2-3.

*Prot. Strategies Inc. v. United States*, 76 Fed. Cl. 225, 235 (2007); *see also Planning Research Corp. v. United States*, 971 F.2d 736, 741 (Fed. Cir. 1992) (finding that a bait & switch invalided the award where post-award events demonstrated that the awardee had no plan to actually conform to the solicitation's requirement); *Daewoo Eng'g. and Constr. Co. v. United States,* 73 Fed. Cl. 547, 586-588 (2006) holding that the offeror had committed fraud in the inducement through bait and switch tactics where it had misrepresented its intentions concerning material elements of its offer, including the subcontractors it planned to utilize and its intended sequence and methods of work). Here, the Coast Guard's determination of whether a proposal was technically acceptable relied on whether the offeror complied with the RFQ's requirements of using STRATOS as its airtime services provider. Because ADCI's misrepresentation of its intention to use STRATOS materially influenced the Coast Guard's consideration of their proposal, the contract award should be terminated. *See Unified Architecture & Eng'g v. United States*, 46 Fed. Cl. 56, 64-65 (2000) ("Termination of a contract award based on the proposal is appropriate where such a misrepresentation materially influences an agency's evaluation or an offeror's proposal").

Second, ADCI's proposal cannot form the basis of an award because it failed to provide an accurate certification of compliance. The RFQ requires each offeror to make "[a] statement of compliance that the contract can meet all the services prescribed in this RFQ." *See* Exhibit 1, RFQ, at 1. Clearly, ADCI's "bait and switch" further exemplifies the deficiencies in ADCI's proposal of misrepresenting that it would meet all the requirements set forth in the RFQ.

Third, the Solicitation stated the start date for performance and required proposals to provide full provision of the required services on that date. This delivery schedule or time of performance is a material requirement of this Solicitation. *See Muddy Creek Oil and Gas, Inc.*, B-296836, Aug. 9, 2005, 2005 CPD ¶ 143 at 2 ("Material terms of a solicitation are those which affect the price quantity, quality or delivery of the goods or services offered.").[2] However, ADCI

---

[2] Interpretations of the applicable laws by the Comptroller General or other similar tribunals, while not precedential, have been recognized by this Court to be helpful in the bid protest context. *See, e.g., Planning Research Corp.*, 971 F.2d at 740 (holding that such interpretations by bodies "having expertise are helpful even though not compelling").

did not propose and was not prepared to provide STRATOS service on the required start date of the Contract, as required by the RFQ. As such, ADCI's failure to comply with the RFQ's start date for performance establishes that ADCI's proposal was non-compliant and ineligible for contract award.

"It is well settled that, in a negotiated procurement, a proposal that fails to conform to one or more of the solicitations material requirements is technically unacceptable and cannot form the basis for an award. *In re Universal Yacht Services, Inc*, B-287071, April 4, 2001, 2001 CPD ¶74 at 4 (finding the agency's award to a nonconforming proposal was improper). By failing to comply with these three material requirements of the Solicitation, ADCI's proposal was technically unacceptable and therefore cannot form the basis of an award. Accordingly, the Contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

### B. The Coast Guard Conducted a Defective Evaluation of ADCI's Proposal

The RFQ requires the Coast Guard to evaluate each offeror's proposal as it relates to the Solicitation's requirements and objectives and "make a BPA [Blanket Purchase Agreement] award to the responsible vendor deemed technically acceptable with the lowest quoted price determined to be fair and reasonable." (emphasis added) By failing to exclusively offer STRATOS airtime services, ADCI's proposal did not provide a technically acceptable solution. The Coast Guard failed to recognize this deficiency, and therefore erroneously rated ADCI's proposal as the "Lowest Cost, Technically Acceptable" proposal.

In *Naplesyacht.com, Inc. v. United States*, 60 Fed. Cl. 459 (2004), the agency awarded a contract to an offeror whose proposal failed to meet one of the material requirements of the solicitation. Rather than rejecting the proposal, the agency awarded the contract to the technically unacceptable offeror. *Id.* at 470-71. The court held that the agency abused its discretion by improperly awarding the contract. *Id.* at 471.[3] Similarly here, the Coast Guard's contract award

---

[3] The Court found that the award was improper but denied injunctive relief because the work was already near completion, a circumstance not present here.

to a non-compliant and technically unacceptable offeror is an abuse of discretion which requires termination of the Contract.

Other decisions have also found that the agency's evaluation of a proposal is defective if award is made to a proposal that fails to meet a material requirement. *See Alfa Laval Separation Inc. v. United States*, 175 F. 3d 1365, 1368 (Fed. Cir. 1999) (holding that an offeror is prejudiced if the agency awards to an offeror whose proposal was technically unacceptable); *Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 17. (holding that award of a contract to an offeror that failed to meet a technical requirement of a solicitation is "a clear violation of [ ] procurement statute and regulation.").

Plaintiff L-3 GCS has clearly demonstrated that there was a substantial chance its technically acceptable proposal would have received the contract award but for the Coast Guard's improper evaluation. Had the Coast Guard properly evaluated ADCI's proposal in accordance with the RFQ's requirements, the Coast Guard would have identified ADCI's lack of compliance with the RFQ and determined that they were ineligible for contract award. The Coast Guard's defective evaluation of ADCI's proposal was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law and regulation. By awarding the Contract to ADCI on the basis of a technically unacceptable proposal, the Coast Guard committed a clear violation of a procurement statute and regulation. L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's defective evaluation of ADCI's proposal. Accordingly, the contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

### C. The Coast Guard Failed to Follow the Requirements Set Forth in the RFQ and Improperly Waived Mandatory Requirements for the Benefit of ADCI

The RFQ required provision of STRATOS as the exclusive provider of airtime services, required certification of compliance with the RFQ requirements and required offerors to propose provision of all services (including STRATOS) by the dates set forth in the RFQ. Under the RFQ's requirements, the Coast Guard should have rated ADCI's proposal as technically unacceptable. Instead, the Coast Guard improperly waived the requirements of the RFQ for the

benefit of ADCI, failed to follow the requirements of the RFQ in accordance with its obligations, and improperly determined the ADCI proposal to be technically acceptable. If the Coast Guard had not waived mandatory requirements for the benefit of ADCI, the ADCI proposal would have been disqualified from further consideration and would not have received a contract award.

"When an agency relaxes its requirements, either before or after receipt of proposals, it must issue a written amendment to notify all offerors of the changed requirements. *SWR, Inc.*, B-284075, Feb. 16, 2000, 2000 CPD ¶43 (finding that the award was improper because the Agency "relaxed the RFP requirements" in favor of the awardee). The Coast Guard's waiver of material requirements in the Solicitation (for ADCI's benefit) without notifying all offerors of such a change prohibited the offerors from being able to compete on an equal basis. *Naplesyacht.com, Inc.* 60 Fed. Cl. at 471-72 (2004) (internal quotation and citations omitted). By failing to follow the RFQ's requirements, the Coast Guard violated its obligations to the offerors, and therefore its award to ADCI was improper. *See Low & Associates, Inc.*, B-297444.2, April 13, 2006, 2006 CPD¶76 at 8 (finding that the agency's award prejudiced the protester because it permitted the awardee "to propose to perform the contract requirements as a basis that was materially different than that required by the solicitation").

Because the Coast Guard failed to follow the RFQ's requirements and select the "Lowest Cost, Technically Acceptable" proposal, the Contract should have been awarded to L-3 GCS as the offeror representing the best value to the Government. The Coast Guard's failure to follow the RFQ's requirements was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law and regulation. *See JWK v. United States*, 52 Fed. Cl. 650, 659 (2002). L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's failure to follow the RFQ's requirements. Accordingly, the Contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

### D. The Coast Guard Failed to Treat Offerors Equally

It is a fundamental principle of Government procurement law that competition must be conducted on an equal basis, that is, the offerors must be treated equally and be provided with a

common basis for the preparation of their proposals. *See TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001). The Coast Guard violated this fairness requirement by failing to disqualify the ADCI proposal. In doing so, the Coast Guard improperly waived mandatory requirements for the benefit of ADCI while the requirements remained in place for the evaluation of the L-3 GCS proposal. Specifically, ADCI was not required to designate STRATOS as the exclusive airtime services provider, to provide an accurate certification of compliance with the Solicitation or to offer the required performance (including STRATOS) promptly at time of contract award. *See supra* Part II.A. These apparent differences in treatment of L-3 GCS and ADCI demonstrate that the Coast Guard failed to treat offerors equally.

By improperly rating ADCI's proposal as "technically acceptable," the Coast Guard failed to apply the evaluation criteria equally and failed to discharge its duty to apply the same evaluation standard to all offerors. *See Low & Assocs., Inc.* 60 Fed. Cl. 471-72 (2004); *Naplesyacht.com, Inc.*, B-297444.2, April 13, 2006 (finding that the Navy abused its discretion by failing to notify other offerors that a technically deficient boat would meet its needs). Moreover, the Coast Guard violated federal regulations by not awarding the Contract to L-3 GCS as the offeror representing the best value to the Government *See* FAR § 8.405-2(d) (requiring agencies to "[p]lace the order, or establish the BPA, with the schedule contractor that represents the best value").

L-3 GCS has been directly harmed by the Coast Guard's unequal treatment of offerors. Had the Coast Guard treated the offerors in an equal manner, it would have awarded the Contract to L-3 GCS as the offeror representing the best value to the Government. The Coast Guard's failure to treat offerors equally was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law and regulation. L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's failure to treat offerors equally. Accordingly, the Contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

## III. L-3 GCS WILL SUFFER IRREPARABLE HARM IF PRELIMINARY INJUNCTIVE RELIEF IS DENIED

L-3 GCS will suffer irreparable injury if injunctive relief is denied because (1) it will have been denied the ability to fairly compete for this Contract; (2) it will lose the profits from this Contract; and (3) its absorption and allocation of indirect costs will be seriously affected, which will create a competitive disadvantage in seeking other contracts. L-3 GCS does not have an adequate remedy at law, and therefore preliminary injunctive relief is appropriate.

The Court should grant preliminary injunctive relief in order to preserve the status quo. *See Advanced Sys. Tech., Inc.*, 69 Fed. Cl. 474, 475 (2006) (granting plaintiff's motion for preliminary injunction in order to preserve the status quo until the court has ruled on the merits). Because L-3 GCS is an incumbent contractor and continues to provide INMARSAT fleet satellite airtime services to the Coast Guard, it faces substantial harm and prejudice if the Coast Guard is not enjoined from switching the provision of such services to ADCI prior to the Court ruling on the merits of this case. *See Seems Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (affirming a temporary injunction where the balance of hardships weighed in the plaintiff's favor and the plaintiff's right to continue a business it had engaged in for a period of years was "not measurable . . . in monetary terms").

Moreover, L-3 GCS will suffer irreparable injury if the injunction is not granted but it is later awarded the Contract. First, L-3 GCS will be denied significant profits by not being able to provide satellite airtime services to the Coast Guard. *See* Exhibit 4, Myers Decl. ¶ 22. This loss, by itself, satisfies the "irreparable harm" requirement of obtaining injunctive relief. *See OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 659 (2005) (finding that "a loss of potential profits stemming from a lost opportunity to compete [is] sufficient to constitute irreparable harm"). In fact, "a plaintiff moving for preliminary injunction need only allege, in order to establish

irreparable injury, that by failing to enjoin, it will not be awarded the contract and will lose profits thereunder." *TRW Envtl. Sys. Inc. v. United States*, 16 Cl. Ct. 520, 529 (1989); *see also Hospital Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) (finding that "loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm"). Furthur, denying the injunction will have a very significant detrimental effect on L-3 GCS's indirect rates and cost structure. This, in turn, will cause L-3 GCS to suffer a competitive disadvantage in its efforts to obtain other government and commercial contracts. *Id.* at ¶ 22.

L-3 GCS will suffer irreparable harm unless this Court enjoins performance of the Contract. Therefore, L-3 GCS respectfully requests that the Court grant preliminary injunctive relief in order to preserve the status quo and ensure that an ultimate remedy is available.

## IV. THE BALANCE OF HARDSHIPS WEIGHS IN FAVOR OF GRANTING L-3 GCS'S MOTION FOR PRELIMINARY INJUNCTION

In evaluating the balance of hardships, the Court must consider whether the significant and irreparable injury that L-3 GCS will suffer, *see supra* Part III, outweighs the harm, if any, to the Government and ADCI. *See Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705, 715-16 (2006) (finding that the balance of hardships tilted in plaintiff's favor when the contracted services would not be interrupted and the defendant-intervenor would not be significantly harmed by a preliminary injunction). Here, a preliminary injunction will not cause any appreciable harm to the Government or ADCI. Therefore, the balance of hardships weighs heavily in favor of granting the requested preliminary injunction.

### A. The Government Will Suffer No Harm If The Court Enters A Preliminary Injunction

The Government will not suffer any harm from a preliminary injunction in this case. Although the Contract was awarded on December 3, 2007, the Coast Guard has yet to switch to ADCI as the provider of satellite airtime services. In fact, ADCI has been unable to fully perform the Contract, and it is unclear when or if they will be able to do so. As a result, the Coast Guard has requested that L-3 GCS continue to service the incumbent contract. More importantly, L-3 GCS is ready, willing, and able to continue to provide satellite airtime services during the period in which a preliminary injunction would apply. *See* Myers Decl. ¶ 23. L-3 GCS's willingness to perform the Contract is dispositive because the Government cannot claim any harm if it continues receiving comparable services during the pendency of an injunction. *See, e.g., Advanced Sys. Tech., Inc.*, 69 Fed. Cl. at 486 (finding that the balance of hardships weighed in the plaintiff's favor because the Government "can continue to acquire the services uninterrupted" while the Court determines the merits of the case); *Great Lakes Dredge & Dock Co. v. United States*, 60 Fed. Cl. 350, 370 (2004) (finding that the government will not suffer any harm where it "will receive precisely what it solicited, and what it still needs").

To the contrary, the Government will suffer significant harm if injunctive relief is not granted because ADCI, by continuing its performance, will implement a non-compliant and technically unacceptable solution that is incompatible with the Coast Guard's existing hardware, software, and other communications systems. Once L-3 GCS is no longer servicing these systems, the Coast Guard will have to incur additional costs and delays in order to remedy the incompatibility issues caused by ADCI's lack of compliance with the RFQ. In fact, the Coast Guard has indicated that use of any airtime service provider other than STRATOS would force the Coast Guard to undertake a wholesale, prohibitively expensive reconfiguration of their network,

the extra costs and time associated with such a conversion. *See* Myers Decl. ¶ 11. While the Coast Guard attempts to resolve these technical problems, the lack of a properly functioning communications system could have a significant adverse impact on the Coast Guard's readiness and on national security. Consequently, the Government will only suffer harm if the injunction is not entered.

### B. The Potential Harm To ADCI If The Court Enters A Preliminary Injunction Is, At Most, Minimal

The potential harm to ADCI if the Court grants injunctive relief is, at most, minimal. The Court is quite capable of addressing the merits of this action in an expeditious and efficient manner, and therefore, any delay resulting from a preliminary injunction will be brief. Because ADCI has not performed the Contract in accordance with the RFQ, any costs that they have incurred to date are a result of the deficiencies in their proposal. *See* Myers Decl. ¶ 15. Furthermore, ADCI received an award it did not deserve, and consequently should not benefit from the Coast Guard's defective evaluation of a non-compliant proposal. ADCI should also not benefit from conducting a "bait and switch" in which they provided an inferior solution that failed to satisfy the Coast Guard's technical requirements. As such, any harm that a delay may cause ADCI is outweighed by the harm to L-3 GCS if injunctive relief is denied and it is later determined that L-3 GCS was unreasonably and improperly denied award of the Contract. *See Isratex, Inc. v. United States*, 25 Cl. Ct. 223, 231 (1992).

## V. PRELIMINARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

The public has substantial interest in maintaining the integrity of the federal procurement process. *See Advanced Sys. Tech., Inc.*, 69 Fed. Cl. at 486. That interest is best served "by allowing the government to proceed with contract awarded in a manner consistent with fair and open competition, to the contractor offering the best value." *Labat-Anderson Inc. v. United States*,

50 Fed. Cl. 99, 110 (2001). Here, an injunction would serve the public interest because the Coast Guard conducted a defective evaluation, failed to follow the requirements of the Solicitation, failed to treat the offerors equally and improperly awarded the Contract to a non-compliant offeror. *See supra* Part II. As a result, the Coast Guard abused its discretion in evaluating the offerors' proposals, which compromised the procurement process.

"[The] public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations." *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000). The Coast Guard's award of the Contract to ADCI is clearly contrary to the public interest. Specifically, the RFQ mandated exclusive STRATOS airtime service, and the Coast Guard awarded the Contract to an offeror whose proposal failed to meet this material requirement. In addition, the public has an important interest in the effective and efficient operation of the Coast Guard's communication system. ADCI's incompatibility issues would disrupt and delay the Coast Guard's ability to communicate. *See* Myers Decl. ¶ 18. Limiting the communications capability of a Coast Guard Cutter compromises both mission readiness capability and the safety of the crew.

As a result, an order enjoining Defendant from permitting ADCI to begin or continue performance under the Contract would serve the public interest. *See Asia Pac. Airlines v. United States*, 68 Fed. Cl. 8, 27 (Ct. Cl. 2005) (finding that plaintiff is entitled to injunctive relief where disrupting and delaying the delivery of the mail would adversely affect the public interest).

Because staying performance of the Contract will maintain the status quo, will not impair services provided to the Government, and will prevent ADCI from further benefiting from its improper behavior, these public interests are paramount and best served by granting the preliminary injunction. *See PGBA, L.L.C. v. United States*, 57 Fed. Cl. 655, 663 (2003).

## CONCLUSION

For all of the foregoing reasons, L-3 GCS respectfully requests that the Court grant its motion for preliminary injunction.

Dated: February 22, 2008

Respectfully submitted,

Ronald K. Henry
KAYE SCHOLER, LLP
901 15th Street, NW
Suite 1100
Washington, DC 20005
Phone: (202) 682-3500
Fax: (202) 682-3580
rhenry@kayescholer.com

*Attorney for L-3 Global Communications Solutions, Inc*