REDACTED VERSION

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC. | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 08-101C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Ronald K. Henry
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 682-3500 telephone
(202) 682-3580 facsimile
*rhenry@kayescholer.com*

Date: May 23, 2008

*Attorney for L-3 Global Communications Solutions, Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................ 1

ARGUMENT ........................................ 2

A. The Solicitation ........................................ 2

B. The Offerors ........................................ 4

C. The Evaluation and Award ........................................ 5

D. The Debriefing ........................................ 6

E. The Improper Waiver of Mandatory Requirements and the Attempts to Implement the Non-Compliant Proposal ........................................ 7

F. Legal Standards Governing Judgment On The Administrative Record ........ 16

G. ADCI's Proposal Was Technically Unacceptable and Therefore Ineligible for Contract Award ........................................ 18

H. The Coast Guard Conducted A Defective Evaluation Of ADCI'S Proposal ........................................ 19

I. The Coast Guard Failed To Treat Offerors Equally ........................................ 21

J. The Coast Guard Improperly Assisted ADCI In Implementing Its Non-Compliant and Technically Unacceptable Proposal ........................................ 22

CONCLUSION ........................................ 22

**TABLE OF AUTHORITIES**
**CASES**

*Alfa Laval Separation*,
175 F.3d 1365 (Fed. Cir. 1999)....................17, 18

*Banknote Corp. of Am., Inc. v. United States*,
365 F.3d 1345 (Fed. Cir. 2004)....................17

*Bannum, Inc. v. United States*,
404 F.3d 1346 (Fed. Cir. 2005)....................16

*Beta Analytics Int'l, Inc. v. United States*,
44 Fed. Cl. 131 (1999)....................19, 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)....................17

*Data Gen. Corp. v. Johnson*,
78 F.3d 1556 (Fed. Cir. 1996)....................17

*Dubinsky v. United States*,
44 Fed. Cl. 509 (1999)....................19

*E.W. Bliss Co. v. United States*,
77 F.3d 445 (Fed. Cir. 1996)....................18

*Grade-Way Constr. v. United States*,
7 Cl. Ct. 263, 265 (1985)....................18

*Halter Marine, Inc. v. United States*,
56 Fed. Cl. 144 (2003)....................19

*Info. Scis. Corp. v. United States*,
73 Fed. Cl. 70 (2006)....................16

*Int'l Outsourcing Servs., LLC v. United States*,
69 Fed. Cl. 40 (2005)....................16

*In re Universal Yacht Servs., Inc.*,
B-287071, April 4, 2001, 2001 CPD ¶ 74

*ManTech Telecomms. and Info. Sys. Corp. v. United States*,....................18
49 Fed. Cl. 57 (2001)....................18

*Mangi Envtl. Group, Inc. v. United States*,
47 Fed. Cl. 10 (2000)....................18

*Mike Hooks, Inc. v. United States*,

39 Fed. Cl. 147 (1997) ....................16

*Muddy Creek Oil and Gas, Inc.*,
B-296836, Aug. 9, 2005, 2005 CPD ¶ 143 ....................18

*PHT Supply Corp. v. United States*,
71 Fed. Cl. 1 (2006) ....................18

*Planning Research Corp. v. United States*,
971 F.2d 736 (Fed. Cir. 1992) ....................22

*TLT Constr. Corp. v. United States*,
50 Fed. Cl. 212 (2001) ....................21

**STATUTES**

5 U.S.C. § 706(2) ....................17

10 U.S.C.S. § 2305(b)(1) (2008) ....................19

48 C.F.R. § 15.305(a) (2008) ....................19

Plaintiff L-3 Global Communications Solutions, Inc. ("L-3 GCS"), by its undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Judgment on the Administrative Record.

## PRELIMINARY STATEMENT

One of the most fundamental principles in the law of government contracts is that an agency is not allowed to make award to a proposal which fails to comply with a mandatory requirement of the solicitation. The violation of this fundamental principle is exactly what happened in the award which led to this protest.

In this procurement, the Coast Guard sought offers for the provision of satellite communications airtime services. Because STRATOS is the only airtime services Land Earth Station Operator ("LESO") provider which is configured to be compatible with both the Coast Guard Fleet-55 terminals and Coast Guard data network, the solicitation required that all proposals must exclusively offer STRATOS as the airtime services provider. Plaintiff L-3 GCS submitted a fully compliant proposal. The awardee, ADCI of Delaware, LLC ("ADCI"), did not.

Instead, ADCI chose to offer a non-compliant LESO, Telecom Italia, in hope of achieving a price advantage over the other competitors. The result was that the ADCI proposal was about percent less costly than the L-3 GCS proposal but the ADCI proposal was non-compliant, and, accordingly, could not lawfully be accepted. Unfortunately, the Agency became fixated solely upon the modest price advantage and made award to the non-compliant ADCI proposal. As admitted by the Agency:

> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR zone boats/terminals will have to program "555" [Telecom Italia] instead of "013" [STRATOS] as the LES.

AR 334.

> [W]ith Tele-Italia they were able to bid about less per unit of F55 ISDN and approx. less for MPDS than we're currently paying.

AR 396.

> Response to Q#3 clearly states STRATOS is the mandatory LESO for MPDS and ISDN traffic. ADCI's bid is based on using Tele-Italia.

AR 349.

> To lower overall airtime charges the ADCI contract requires the use of Telecom Italia for routing all Fleet 55 services. Technically this is possible, but when the RFP was issued and further clarified when packaged with vendor Questions and Answers, the Coast Guard clarified that the existing LES [STRATOS] must be the termination point.

AR 402.

The unequivocal certainty in this litigation is that the Coast Guard accepted a non-compliant offer. Simply put, they can't do that and this protest must be sustained.

L-3 GCS was the lowest priced, technically acceptable offeror. L-3 GCS was prejudiced by the unlawful award made to ADCI. The contract awarded to ADCI must be terminated and award must be made to L-3 GCS.

## ARGUMENT

### A. The Solicitation

On October 22, 2007, the Coast Guard issued Request for Quotation No. HSCG23-08-Q-TMM001 ("RFQ" or "Solicitation"), which sought to continue existing satellite airtime services for the Coast Guard's INMARSAT Mini-M and Fleet series terminals under the General Services Administration ("GSA") Federal Supply Schedule ("FSS") 70 Contract. AR 53. In describing the bid evaluation process, the RFQ stated that "[t]he Government will evaluate your quote, and make a BPA award to the responsible vendor deemed technically acceptable with the lowest quoted price determined to be fair and reasonable." *Id.* at 53-54.

The Solicitation explained that the Coast Guard had been using STRATOS since the inception of the USCG COMSATCOM program and explained some of the reasons for the required exclusivity of STRATOS as the LESO. AR 13. Because STRATOS is the only commercial airtime service provider configured to be compatible with both the Coast Guard's Fleet-55 (including shipboard) terminals and the Coast Guard Data Network ("CGDN"), the Coast Guard Solicitation required that all proposals offer only STRATOS as the LESO. AR 13, 90, 92, 349, 357 and 402. By having the offeror utilize STRATOS, the Coast Guard would not have to undertake a wholesale, prohibitively expensive reconfiguration of their network. *Id.* This requirement was also necessary for the provision of satellite airtime services because all of the Coast Guard's terrestrial connectivity runs through STRATOS Land Earth Stations. *Id.*

To further clarify the RFQ, the agency responded to vendor questions, in Question Set #1, as follows:

> Question #7: Are we free to utilize any INMARSAT Land Earth Station Operator (LESO), regardless of the location of the station where the traffic passes through or the nationality of the individuals who have access to the call data?
>
> Answer #7: No. The Coast Guard prefers that the vendor utilizes the Land Earth Station Operator that we currently work with and that anyone who has access to the actual call data is a United States citizen.

AR 90.

Leaving no ambiguity whatsoever, the Coast Guard returned to the subject in Question Set #2, as follows:

> Question #3: Given that the MPDS and ISDN traffic is terminated terrestrial using the existing LESO, we assume that it is mandatory that we use that same LESO for this requirement. If so, please state who that LESO is.
>
> Answer #3: STRATOS.

AR 92.

There is no dispute in this litigation about the fact that STRATOS is the mandatory LESO. There is also no dispute about the fact that ADCI failed to propose STRATOS as the LESO for the Fleet-55 terminals as required by the RFQ:

> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR zone boats/terminals will have to program "555" [Telecom Italia] instead of "013" [STRATOS] as the LES.

AR 334.

> [W]ith Tele-Italia they were able to bid about less per unit of F55 ISDN and approx. less for MPDS than we're currently paying.

AR 396.

> Response to Q#3 clearly states STRATOS is the mandatory LESO for MPDS and ISDN traffic. ADCI's bid is based on using Tel-Italia.

AR 349.

> To lower overall airtime charges the ADCI contract requires the use of Telecom Italia for routing all Fleet-55 services. Technically this is possible, but when the RFP was issued and further clarified when packaged with vendor Questions and Answers, the Coast Guard clarified that the existing LES [STRATOS] must be the termination point.

AR 402.

**B. The Offerors**

L-3 GCS was established in 1995 as a supplier of satellite communications products, airtime services, and turnkey systems solutions to US and international military, government, industrial, and commercial accounts. L-3 GCS is a key provider of International Maritime Satellite ("INMARSAT") airtime and, during the past 18 months alone, has managed more than 6 million airtime minutes for the Department of Defense, federal/civil agencies, emergency response and commercial customers, making L-3 GCS one of the largest providers of INMARSAT services in the world. L-3 GCS is also the incumbent on the predecessor contract for INMARSAT satellite airtime services to the Coast Guard Fleet-55 terminals. AR 113-148.

On November 2, 2007, L-3 GCS submitted a timely proposal in response to the RFQ. *Id.* In its proposal, L-3 GCS designated STRATOS as its only airtime services provider. AR 120. L-3 GCS provided its bid with the understanding that STRATOS was a mandatory requirement of the RFQ and that all offerors were required to bid STRATOS as their exclusive airtime services provider. AR Tab 26, Declaration of Jeff Myers ("Myers Decl.") ¶ 8. L-3 GCS was aware of the existence of lower cost airtime services providers, but believed that offering those providers would result in disqualification of their bid. *Id.* at ¶ 9.

In contrast, ADCI submitted a one page technical proposal (AR 100) that did not offer STRATOS for the Fleet-55 terminals. AR 334, 349, 396 & 402. Note in particular the careful wording of the ADCI proposal:

AR 100.

While talking about STRATOS for use with the Mini-M terminals, ADCI carefully did not mention offering STRATOS coverage for the Fleet-55 terminals.

The third offeror, like L-3 GCS, offered to

AR 426.

### C. The Evaluation and Award

Since it is undisputed that ADCI did not offer STRATOS for the Fleet-55 terminals (AR 334, 349, 396 & 402), it follows that ADCI either misled the Agency or the Agency conducted a defective technical evaluation. The administrative record contains evidence of both. In either event, the award to the non-compliant ADCI proposal must be set aside.

Certainly, the ADCI proposal was misleading. As noted above, the ADCI proposal acknowledged the importance of STRATOS but carefully confined that acknowledgement to the

Mini-M terminals. Notwithstanding this sleight-of-hand, the Agency knew or should have known that the ADCI proposal was non-compliant. For example, with respect to the

proposal, the Evaluators specifically took note of the provision of STRATOS as the LESO. AR 156 and 170. In contrast, the Evaluators said of ADCI:

> [T]hey did not go into any details I would have liked to see stated . . .
>
> They do support USCG now as stated but not without constant corrections and billing clarifications.

AR 176, 174.

The simplest answer to the cause of the unlawful award is that the Agency was hoodwinked. As stated by Evaluator Sonia Kendall afterwards:

> ADCI should have mentioned the technical changes that they were going to require as part of the contract, if awarded to them, when they responded to the RFQ. None of us thought of asking about the terrestrial connectivity services since they had always used STRATOS in the past [as the incumbent for the Mini-M terminals].

AR 350.

At the same time, the Agency was perfectly content to be hoodwinked, "[W]ith Tele-Italia they were able to bid about less per unit of F55 ISDN" (AR 396), and, as discussed below, the Agency worked diligently to help ADCI implement its non-compliant proposal.

The ADCI proposal was non-compliant and should have been rejected. Because the award to ADCI was unlawful, the ADCI contract must be cancelled and an award must be made to L-3 GCS.

### D. The Debriefing

Following announcement of the award to ADCI, L-3 GCS promptly requested a debriefing. Myers Declaration, AR Tab 26. In the debriefing, L-3 GCS stated its understanding that STRATOS was the mandatory LESO for Fleet-55 terminals and explained that L-3 GCS had

proposed STRATOS because of this mandatory requirement despite being aware of the availability of lower-cost service providers. *Id.* at ¶¶ 7-9 and 15. In addition, L-3 GCS asked Coast Guard representatives to confirm that STRATOS was indeed the mandatory LESO and Agency representatives did so confirm this requirement. *Id.* at ¶ 14.

Finally, L-3 GCS specifically and directly placed the Coast Guard on notice that ADCI had either misled the Coast Guard into thinking that ADCI would provide STRATOS or that ADCI had concealed its intent to provide a LESO other than STRATOS. *Id.* at ¶ 16.

Accordingly, no later than the December 20 debriefing, the Agency was absolutely on notice that it had accepted a non-compliant proposal. Still, the Agency took no action to cancel the unlawful award. Instead, as demonstrated in the following section, the Agency undertook concerted efforts to assist ADCI in implementing the non-compliant proposal.

### E. The Improper Waiver of Mandatory Requirements and the Attempts to Implement the Non-Compliant Proposal

Contrary to the RFQ's requirements, the Coast Guard failed to hold a kick-off meeting within five days after the award to discuss the transition to ADCI. AR 57. Instead, the Agency simply commenced the process of implementing the non-compliant proposal with full knowledge that it was non-compliant. On January 4, 2008, Paul Searles, the CTR, wrote to all of the members of the evaluation team to confirm the details of how the non-compliant proposal would be implemented:

> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR zone boats/terminals will have to program '555' [Telecom Italia] instead of '013' [STRATOS] as the LES they use when conducting COMMS. It is the LES for TI (Telcom Italia); they've been in the business a long time & are good coalition partners in the INMARSAT world . . . . NONE of the Mini-M terminals is affected by this; it is for the Fleet-55's only.

AR 334.

Lt. Sonia Kendall, one of the evaluators, endorsed this non-compliant, bait-and-switch implementation and responded to Mr. Searles and to Doug Thomas, the ADCI representative, as follows:

> Thank you Paul. Doug, I apologize for not getting back to you . . . . It sounds like Paul is taking care of this issue and will let me know if anything is needed from my end . . .

AR 335.

In another message, evaluator Kendall wrote:

> Thanks for the head's up and also for contacting the vessel operators to give them a head's up of the change. Nice to see this 'after the contract is awarded' information coming out of the woodwork! : -)

AR 336.

While the Agency was perfectly happy to waive the mandatory requirements in order to accept the non-compliant proposal, implementation of the bait-and-switch soon became a major technical effort for the Agency itself. On January 6, 2008, Mr. Searles began handling an increasingly urgent set of technical issues associated with the implementation of the bait-and-switch:

> Situation: We receive technical support from STRATOS technicians in setting up IP addressing, connecting to our CGDN+, troubleshooting as needed, etc., for our fleet terminals. Do you know (from your experience) if this support will be negatively affected or at risk if we use other than STRATOS LES for our default?

AR 337.

Soon, the technical issues associated with implementing the non-compliant proposal began to multiply:

> If we're using Tele Italia or another LES does STRATOS have visibility to see what clear cause codes our mobiles are receiving, that sort of thing. If we don't use STRATOS LESs I don't think they can help us . . . just am not sure . . .

> When you say 'support,' what are the specific services with which you are dealing? . . . This affects our installation instructions we have with our contractor. Can we confirm w/STRATOS that this won't affect their support for the CG?

AR 338.

By January 14, 2008, the Coast Guard had realized that implementation of the bait-and-switch and associated waiver of the mandatory requirements was going to be more complicated than first thought. Accordingly, the Coast Guard instructed DISA to suspend the transition of Fleet-55 terminals to ADCI:

> New contractor's solution was insufficient to meet the technical requirement. Restoring to DITCO MGMT.

AR 250, 260, 263, 266, 269, 272, 275, 277, 280, 283, 286, 288, 291, 294 and 297.

The discovery of technical difficulties in implementing the non-compliant proposal did not abate the Agency's willingness to continue its effort to waive the mandatory requirements and implement the bait-and-switch. On January 17, 2008, the Coast Guard held a meeting with Doug Thomas of ADCI to continue moving forward with the bait-and-switch:

> This meeting will likely allow your technical issue you raised in a previous e-mail to be addressed (related to switching F-55's to Telecom Italia), unless you've already ironed it out.

AR 340. Mr. Searles later summarized the January 17, 2008 meeting as follows:

> TISCOM hosted a meeting with ADCI (Doug Thomas), CG-62 (LT Kendall - mtg scheduler). TISCOM attendees were LCDR Vogel [another evaluator], Tom Stewart, Rick Sozzi [the third evaluator] and Paul B. Searles. Outcome of the meeting determined ADCI's technical solution (using TI's 555 LES code) was not able to permit the CG Cutters access to the CGDN. CG-62 and LDCR Vogel agreed I must move the terminals back to DISA/DITCO management until problems were resolved. ADCI's Doug Thomas was to make a trip to visit Telecom Italia the following week to discuss the technical issues/options.

AR 419.

Note, most particularly, the phrasing "until problems were resolved" and the determination that the next step would be a trip to visit Telecom Italia to "discuss the technical issues/options." This Agency had every intention of waiving the mandatory requirements, accepting the non-compliant proposal, and implementing the bait-and-switch.

The next day, Lieutenant Commander Paul Vogel reported to Commander Christopher Meade:

> Regarding the bad news Air Time Kick off mtg yesterday: Here's the question set that the CG responded to that all prospective bidders received.
>
> Response to Q #3 clearly states that STRATOS is the mandatory LESO for MPDS and ISDN traffic. ADCI's bid is based on using Tel-Italia, whose LES is in Fachino, Italy . . . . Sonia is putting together a summary and will be meeting with ACS today <u>to see what we can do going forward</u>.

AR 349 (emphasis added).

"Going forward" with the non-compliant proposal, the agency found more technical impediments:

> We were informed by Doug Thomas, ADCI, a few weeks ago that our cutters will have to change their dialing procedures, which included dialing into a new Land Earth Station, which are owned by Telecomm Italia . . . . Yesterday, during the meeting, it was discovered that by using Telecomm Italia Land Earth Stations, the Coast Guard would be required to install all new terrestrial connectivity T1 lines, modems, etc. Telecomm Italia has no link to STRATOS, so therefore, there would be no way for Telecomm Italia to route our traffic over to our CAMS. . . .
>
> ADCI should have mentioned the technical changes that they were going to require as a part of the contract, if awarded to them, when they responded to the RFQ. None of us thought of asking about the terrestrial connectivity services since they had always used STRATOS in the past.

AR 350.

While the technical problems with the acceptance of the non-compliant offer multiplied, the efforts to implement the bait-and-switch also intensified:

> EMERGENCY Important Meeting Request . . . Doug Thomas of ADCI has acknowledged receipt of the subject meeting request (via telephone, 1/28/08), and WILL BE in attendance.

AR 369.

The Emergency Meeting was held on January 29, 2008. AR 372 and 384. The outcome of the "emergency meeting" was a determination to press ahead with the non-compliant proposal and the implementation of the bait-and-switch. On February 2, 2008, Evaluator Sonia Kendall wrote:

> Did you receive an e-mail yet from Doug Thomas outlining how ADCI thinks that they can technically have the ability to route our traffic through Telecom Italia? If so, can you forward my way and if not, hopefully we'll see it on Monday.

AR 386.

On February 4, 2008, ADCI sent its proposed implementation plan for the bait-and-switch, again reconfirming the non-compliant nature of its proposal and its intentions to utilize Telecom Italia rather than STRATOS:

> As part of the supply of INMARSAT airtime services awarded under BPA HSCG23-08-A-TMM001, ADCI of Delaware, LLC proposes to use Telecom Italia as the INMARSAT Land-Earth Station/INMARSAT Distribution Partner for the provision of the Fleet 55 airtime section.

AR 388-395.

Following the Emergency Meeting, the effort to implement the non-compliant proposal remained in full force as Mr. Searles wrote to L-3 GCS, the prior contract incumbent, asking them to keep the Fleet-55 terminals up and running until the non-compliant proposal could be implemented:

> **Please note: This is among the Fleet-55 terminals returned to DITCO for GCSI's management until a sufficient solution is provided by ADCI**.

AR 507 (emphasis in original). This is, in some respects, the most amazing message in the entire administrative record. The Coast Guard rejected the compliant offer of the incumbent contractor, but asked that incumbent contractor to exert special efforts to keep the terminals running until something could be worked out to allow a takeover by the non-compliant offeror.

Finally, one voice inside the Coast Guard began to express reservations. Thomas Stewart wrote:

> I apologize for not seeing this in time to stop ADCI . . . . I met with ADCI several times to discuss this. Technically what they are saying can be done. IMHO [in my humble opinion] it probably isn't worth the effort for several reasons (if it is a
> one time savings)

AR 387.

While the cautionary note from Mr. Stewart is welcomed, please observe that there is still no recognition of the illegality of accepting a non-compliant offer. Mr. Stewart merely expresses the opinion that "it probably isn't worth the effort" to the Coast Guard if there is only a savings of .

The evaluated price difference between the compliant L-3 GCS proposal and the non-compliant ADCI proposal was over the full five year life of the contract, a difference of about .[1] ADCI and other Coast Guard personnel undertook efforts to make the ADCI price advantage look larger in order to justify the non-compliant proposal and the implementation of the bait-and-switch. These efforts erroneously compared the ADCI prices to higher historical prices rather than to the prices offered by L-3 GCS. *See, e.g.*, AR 396.

By February 10, 2008, implementation of the non-compliant proposal had begun to focus on how to get the Telecom Italia service connected to existing Coast Guard resources:

---

1 The five year evaluated price of ADCI was $28,940,581.75. The five year evaluated price of L-3 GCS was . AR 182.

> Question for you to ask ADCI: Has Telecom Italia received confirmation that STRATOS (who owns the LES in NY that houses the servers) is going to authorize them to run the T-1 line into their facility in order to connect with these servers? Telecom Italia and STRATOS are competing companies and a response to this question might be the catch all.

AR 398.

On or about February 12, 2008, the Coast Guard responded to the February 4 ADCI explanation of how it would implement the non-compliant proposal by saying that the Coast Guard remained willing to waive the mandatory requirements but was concerned that it might incur costs that would erode the claimed savings:

> To lower overall airtime charges the ADCI contract requires the use of Telecom Italia for routing all Fleet-55 services. Technically this is possible, but when the RFP was issued and further clarified when packaged with vendor Questions and Answers, the Coast Guard clarified that the existing LES must be the termination point. . . . ADCI estimates that it can save the Coast Guard approximately in airtime cost but what will need to be subtracted from this savings is the cost of establishing and maintaining this new terrestrial network, approximately half the savings costs.

AR 403.

Unquestionably, the Coast Guard remained ready to proceed with the non-compliant proposal and to implement the bait and switch. The whole discussion was simply a matter of cost. As discussions intensified, legal counsel for the Coast Guard and ADCI became involved in the negotiations:

> Since the company lawyer already communicated with our legal office, please provide package for review for legal counsel prior to communicating with ADCI.

AR 404.

On February 22, 2008, L-3 GCS filed its protest alleging that the Coast Guard had conducted a defective technical evaluation, accepted a non-compliant proposal, participated in a bait and switch, failed to follow the evaluation criteria set forth in the solicitation, failed to treat

offerors equally, and otherwise violated applicable law and regulation. The proof of all those allegations is fully demonstrated in the administrative record and was well known to the Coast Guard at the time of the protest filing. Notwithstanding this knowledge, the Coast Guard continued its efforts to proceed with the non-compliant proposal and to implement the bait and switch. The Coast Guard itself undertook the extraordinary step of contacting STRATOS to attempt to negotiate an arrangement under which STRATOS would allow Telecom Italia to connect to STRATOS facilities and cure the connectivity problems associated with the non-compliant proposal for the use of Telecom Italia. Evaluator Sonya Kendall wrote to the Contracting Officer, Walt O'Brien, as follows:

> Hi Walt, as per our conversation, here is Carole Hochberg's email address. She is the SGSI (STRATOS Government Services) director of contracts. She is looking for something more official than just a phone con between me and my contact (mike carew) regarding what ADCI is proposing in their contract response.

AR 412.

Incredibly, a United States Government Contracting Officer then chose to become an agent for ADCI in attempting to implement the bait and switch, as Mr. O'Brien wrote to STRATOS:

> Ms. Hochberg,
>
> I am the U.S. Coast Guard Contracting Officer for procurement with the ADCI Corporation to provide Airtime Services to the Coast Guard. Under that procurement our Contractor has suggested using a T-1 communications line from a Telecom Italia facility directing into your facilities in New York (to be provided by the Contractor itself or by the Coast Guard) as a pipeline for the flow of information to Coast Guard systems centers. I wanted to inquire as to whether this is acceptable to your company. We are still working out details with our Contractor and this information will be helpful in our decision as to the best course of action for the Coast Guard.

AR 414.

This email is stunning. It is hard to imagine a more totally inappropriate response by a contracting officer whose highest duty is to conduct a fair procurement that treats all offerors equally and makes an award in accordance with the requirements set forth in the solicitation. Knowing that the ADCI proposal was non-compliant, knowing that L-3 GCS had submitted a compliant proposal, knowing that implementation of the bait and switch was still "stuck" after nearly three months of intense effort, this contracting officer intervened with a third party in an attempt to make the bait and switch succeed. This is unlawfulness of the highest order and the protest must be sustained.

To its credit, STRATOS responded with integrity and declined to be a party to the scheme. AR 414.

Following the failure of this last-ditch effort to implement the non-compliant proposal and facing the reality of this protest litigation, the Coast Guard asserts that ADCI is now willing to amend its proposal to comply with the undisputed requirements of the solicitation:

> Good morning, Walt.
>
> I just returned from TISCOM and had a message on my machine from Doug Thomas, ADCI, stating that ADCI has made the decision that they will perform the Fleet-55 services as per the contract using the STRATOS's LESs and our existing path for terrestrial connectivity.

AR 421. Ms. Kendall's email continued:

> Also, I imagine this also puts an end to L-3's contract protest since ADCI has determined that they will perform the services.

AR 421.

Ms. Kendall is incorrect. A belated amendment to the ADCI proposal four months after proposal submission and three months after contract award does not end this protest. The ADCI proposal was non-compliant when submitted and it <u>can</u> <u>not</u> lawfully be accepted for award.

A proposal must be compliant with the solicitation at the time it is submitted. The integrity of the procurement process is utterly destroyed if a non-compliant offeror is allowed to have four months of intensive effort to implement a bait and switch and then further allowed to amend its proposal when the bait and switch is detected and resisted.

It is completely unnecessary to discuss at length the types of *quid pro quo* that the agency can make available to ADCI in exchange for its untimely proposal amendment. Favorable change orders? Contract extensions? Favorable treatment in claims and disputes? Waiver of the STRATOS requirement after the heat dies down? All are possible, all are improper, and all demonstrate the need for the fundamental principle that a non-compliant proposal can not be accepted and a proposal can not be retroactively amended after the closing date for submission. The award to ADCI must be cancelled and the contract awarded to L-3 GCS.

### F. Legal Standards Governing Judgment On The Administrative Record

Under RCFC 52.1, a Motion for Judgment on the Administrative Record calls for a review, "given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law." *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 98 (2006). "[T]he existence of a fact question neither precludes the granting of a motion for judgment [on the administrative record] nor requires this court to conduct a full blown evidentiary proceeding." *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005) (citations omitted). Rather, such questions must be resolved by reference to the administrative record "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). "The agency's decision is entitled to a 'presumption of regularity,' but that presumption does not shield the agency's actions from a 'thorough, probing, in-depth review.'" *Mike Hooks, Inc. v.*

*United States*, 39 Fed. Cl. 147, 154 (1997) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

In accordance with the Administrative Procedure Act, the Court is required to set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court may set aside an award if the protester demonstrates by a preponderance of the evidence that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1355 (Fed. Cir. 2004). Additionally, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). In order to demonstrate prejudice, the protester must establish "that there was a substantial chance it would have received the contract but for that error." *Alfa Laval Separation*, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

Plaintiff L-3 GCS has clearly demonstrated that there was a substantial chance that it would have received the contract award but for the Coast Guard's failure to reject ADCI's non-complaint and technically unacceptable proposal. In particular, L-3 GCS submitted a fully compliant proposal utilizing STRATOS and was fully aware of the existence of lower cost airtime services providers, but believed that offering those providers would result in disqualification of their bid. *See* AR at 120; Tab 26, Myers Decl. at ¶ 9. Had the Coast Guard properly determined that ADCI's proposal was ineligible for award, L-3 GCS would have been awarded the contract as the offeror representing the best value to the Government. The Coast Guard's award to ADCI based upon a technically unacceptable proposal was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law

and regulation. L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's improper award. *See Alfa Laval Separation Inc.*, 175 F.3d 1365, 1368 (Fed. Cir. 1999) (holding that an offeror is prejudiced if the agency awards to an offeror whose proposal was technically unacceptable). Accordingly, the contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

### G. ADCI's Proposal Was Technically Unacceptable and Therefore Ineligible for Contract Award

It is well settled that, "[i]n negotiated procurements, a proposal that fails to conform to the material terms and conditions of the Solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 19 (2006) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)) (internal quotations omitted); *see also ManTech Telecomms. and Info. Sys. Corp. v. United States*, 49 Fed. Cl. 57, 71 (2001) (stating that a materially noncompliant proposal cannot form the basis for award); *In re Universal Yacht Servs., Inc.*, B-287071, April 4, 2001, 2001 CPD ¶ 74 at 4 (finding "a proposal that fails to conform to one or more of the Solicitation's material requirements[2] is technically unacceptable and cannot form the basis for an award").

"If the government solicits bids to supply pens, it cannot award the contract to a bidder who offers pencils . . . . Any principle to the contrary would result in unfairness to the other responsive bidders (those who offer to supply pens) and would violate the very purposes and the integrity of the system of competitive bidding." *Grade-Way Constr. v. United States*, 7 Cl. Ct. 263, 265 (Cl. Ct. 1985); *Mangi Envtl. Group, Inc. v. United States*, 47 Fed. Cl. 10, 15 (2000)

2 *See Muddy Creek Oil and Gas, Inc.*, B-296836, Aug. 9, 2005, 2005 CPD ¶ 143 at 2 ("Material terms of a solicitation are those which affect the price quantity, quality or delivery of the goods or services offered.")

(holding that the Agency committed a clear violation of a procurement statute and regulation by awarding the contract to a technically unacceptable proposal).

Numerous decisions have applied the well-established rule that the Agency's award is improper if made to a proposal that fails to meet a material requirement of the solicitation. *See, e.g.*, *Dubinsky v. United States*, 44 Fed. Cl. 509, 512 (1999) (holding that the agency's decision was arbitrary and capricious because it awarded the contract to an offeror whose proposal "failed to comply with two mandatory specifications"); *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 140 (1999) (granting plaintiff's motion for summary judgment because the agency committed error by awarding the contract to an offeror whose "technical proposal violated a mandatory provision of the solicitation"); *In re Universal Yacht Services, Inc,* 2001 CPD ¶ 74 at 4 holding that the agency's award to a nonconforming proposal was improper). Similarly here, ADCI's proposal was not compliant with the mandatory technical requirements of the Solicitation and, therefore, was unacceptable for award.

### H. The Coast Guard Conducted A Defective Evaluation Of ADCI'S Proposal

It is undisputed that the Solicitation required each proposal to provide STRATOS as the exclusive provider of airtime services. It is also undisputed that ADCI's proposal did not provide STRATOS.

"Agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Halter Marine, Inc. v. United States*, 56 Fed. Cl. 144, 169 (2003). This requirement is clear and rooted in procurement law and regulations. *See* 10 U.S.C.S. § 2305(b)(1) (2008) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."); 48 C.F.R. §

15.305(a) (2008) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

"When an agency relaxes its requirements, either before or after receipt of proposals, it must issue a written amendment to notify all offerors of the changed requirements. *SWR, Inc.*, B-284075, Feb. 16, 2000, 2000 CPD ¶ 43 (finding that the award was improper because the Agency "relaxed the RFP requirements" in favor of the awardee); *Candle Corp. v. United States*, 40 Fed. Cl. 658, 665 (1998) (finding that the agency violated procurement statutes and regulations by relaxing the solicitation requirements without notifying all offerors that the evaluation criteria had changed). The Coast Guard's waiver of material requirements in the Solicitation (for ADCI's benefit) without notifying all offerors of such a change prevented the other offerors from being able to compete on an equal basis. By failing to follow the RFQ's requirements, the Coast Guard violated its obligations to the offerors, and therefore its award to ADCI was improper. *See Alfa Laval Separation Inc.*, 175 F. 3d at 1368 (holding that the Navy violated applicable law and regulations by waiving a mandatory technical requirement for the awardee); *Low & Associates, Inc.*, B-297444.2, April 13, 2006, 2006 CPD ¶ 76 at 8 (finding that the agency's award prejudiced the protester because it permitted the awardee "to propose to perform the contract requirements as a basis that was materially different than that required by the solicitation").

The Coast Guard's failure to follow the RFQ's requirements was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law and regulation. L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's failure to follow the RFQ's requirements. Accordingly, the contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

## I. The Coast Guard Failed To Treat Offerors Equally

It is a fundamental principle of Government procurement law that competition must be conducted on an equal basis, that is, the offerors must be treated equally and be provided with a common basis for the preparation of their proposals. *See TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 216 (2001). The Coast Guard violated this fairness requirement by failing to disqualify ADCI's proposal. In doing so, the Coast Guard improperly waived mandatory requirements for the benefit of ADCI while the requirements remained in place for the evaluation of L-3 GCS's proposal. ADCI was not disqualified for its failure to designate STRATOS as the exclusive airtime services provider. This allowed ADCI to bid less than the other offerors because its rates were based on using Telecom Italia. AR 334, 349, 396 and 402. These differences in treatment of L-3 GCS and ADCI demonstrate that the Coast Guard failed to treat offerors equally.

By improperly rating ADCI's proposal as "technically acceptable," the Coast Guard failed to apply the evaluation criteria equally and failed to discharge its duty to apply the same evaluation standard to all offerors. *Beta Analytics Int'l, Inc.*, 44 Fed. Cl. at 139 (finding that "[b]y awarding the contract to HSI based on a facially noncompliant proposal, [the Agency] imposed a disadvantage upon the other offerors for simply following the Solicitation's mandatory terms"). L-3 GCS provided its bid with the understanding that STRATOS was a mandatory requirement of the RFQ, and that all offerors were required to bid STRATOS as their exclusive airtime services provider. AR at Tab 26, Myers Decl. ¶ 8. Due to the existence of lower cost airtime services providers, ADCI's ability to submit a bid with a provider other than STRATOS provided an unfair competitive advantage.

L-3 GCS was substantially prejudiced and directly harmed by the Coast Guard's failure to treat offerors equally. Had the Coast Guard treated the offerors in an equal manner, it would

have awarded the contract to L-3 GCS as the offeror representing the best value to the Government. The Coast Guard's failure to treat offerors equally was arbitrary, capricious, an abuse of discretion, inconsistent with the terms of the RFQ and contrary to law and regulation. *See* FAR § 8.405-2(d) (requiring agencies to "[p]lace the order, or establish the BPA, with the schedule contractor that represents the best value"). Accordingly, the contract awarded to ADCI under the RFQ must be terminated and award made to L-3 GCS.

### J. The Coast Guard Improperly Assisted ADCI In Implementing Its Non-Compliant and Technically Unacceptable Proposal

The Coast Guard had an obligation to reject ADCI's proposal after discovering that the proposal was technically unacceptable. Rather than canceling the contract, the Coast Guard was willing to allow ADCI to utilize a substitute for STRATOS. The Coast Guard's acquiescence and assistance in implementing ADCI's non-compliant and technically unacceptable proposal undermines the integrity of the procurement process. *See Planning Research Corp. v. United States*, 971 F.2d 736, 739 (Fed. Cir. 1992) (affirming board's decision to terminate the contract because "[the Agency] in essence materially modified, after contract award, the contract requirements upon which the competition was based").

## CONCLUSION

The integrity of the procurement process depends upon reliable assurances that the Agency and offerors are complying with applicable procurement law and regulations. The Coast Guard's failure to enforce the RFQ's requirements and willingness to let ADCI develop a workaround using a provider other than STRATOS undermines this process. The Coast Guard's post-award conduct in helping to implement ADCI's non-compliant proposal only further exemplifies the fact that their award was arbitrary, capricious, inconsistent with the terms of the Solicitation and contrary to law and regulation.

For all of the foregoing reasons, L-3 GCS respectfully requests that the Court grant its motion for judgment on the administrative record.

Dated: May 23, 2008

Respectfully submitted,

s/ Ronald K. Henry
Ronald K. Henry
KAYE SCHOLER, LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005
Phone: (202) 682-3500
Fax: (202) 682-3580
*rhenry@kayescholer.com*

*Attorney for L-3 Global Communications Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed on May 23, 2008, with the Clerk of the Court for the United States Court of Federal Claims via the CM/ECF system. This system will send electronic notice of filing to the following individuals:

Dawn S. Conrad
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-2279
Fax: (202) 305-7643

*Attorney for Defendant*

s/ Ronald K. Henry
Ronald K. Henry
KAYE SCHOLER, LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005
Phone: (202) 682-3500
Fax: (202) 682-3580
*rhenry@kayescholer.com*

*Attorney for L-3 Global Communications Solutions, Inc.*