**REDACTED VERSION**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 08-101C

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S <u>MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD</u>**

Ronald K. Henry
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005-2327
(202) 682-3500 telephone
(202) 682-3580 facsimile
*rhenry@kayescholer.com*

Date: July 7, 2008

*Attorney for L-3 Global Communications Solutions, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT AND STATEMENT OF ISSUES .......... 1

ARGUMENT .......... 2

A. The Award To ADCI Is Unlawful Because ADCI Did Not Propose Or Intend To Provide Stratos As The Mandatory LESO .......... 2

B. The "Artfully Drafted" ADCI Proposal Contained No Enforceable Promise To Supply Stratos For The Fleet-55 Terminals. .......... 7

C. The Coast Guard Worked Assiduously To Implement The Non-Compliant Proposal .......... 10

D. The Administrative Record Contains No Support For the Coast Guard Position .......... 12

1. The Claim That ADCI Proposed Stratos But, After Contract Award, Submitted An Unsolicited Change Proposal To Utilize Telecom Italia . 12

2. The Claim That Early Performance Demonstrates ADCI's Proposal And Intention To Utilize Stratos For The Fleet-55 Terminals .......... 16

E. The Governing Legal Standard Is Simple: A Contract Awarded On The Basis Of A Non-Compliant Proposal Is Invalid .......... 20

F. The Claim That The Coast Guard "Did Not Know" About The Non-Compliance Is Unavailing .......... 25

G. L-3 GCS Was Prejudiced By The Acceptance Of The Non-Compliant Proposal .......... 26

H. L-3 GCS Has Established Its Entitlement To Injunctive Relief .......... 27

1. Irreparable Injury .......... 28

2. The Balance of Hardship Weighs In Favor Of Granting Injunctive Relief .......... 28

3. Injunctive Relief Is In The Public Interest .......... 29

## TABLE OF AUTHORITIES

### CASES

*Advanced System Tech., Inc.* v. *United States*, 69 Fed. Cl. 474 (2006) ............................29

*Alfa Laval Separation Inc.*, 175 F.3d 1365 (Fed. Cir. 1999) ............................................21

*Beta Analytics International, Inc.* v. *United States*, 44 Fed. Cl. 131 (1999) ....................21

*E.W. Bliss Co.* v. *United States*, 77 F.3d 445 (Fed. Cir. 1996) ..........................................22

*Great Lakes Dredge & Dock Co.* v. *United States*, 60 Fed. Cl. 350 (2004) .....................29

*Hawpe Construction, Inc.* v. *United States*, 46 Fed. Cl. 571 (2000) ................................27

*Hospital Klean of Texas, Inc.* v. *United States*, 65 Fed. Cl. 618 (2005) ...........................28

*Labat-Anderson Inc.* v. *United States*, 50 Fed. Cl. 99 (2001) .......................................1, 28

*Mangi Environmental Group, Inc.* v. *United States*, 47 Fed. Cl. 10 (2000) .....................21

*Martin Marietta Corp.*, B-233742.4, 90-1 Comp. Gen. Proc. Dec. ¶ 132 (Jan. 31, 1990) .........................................................................................................................24

*Meir Dubinsky* v. *United States*, 44 Fed. Cl. 509 (1999) ..................................................22

*Multi-Spec Products Group Corp.*, B-245156.2, Feb. 11, 1992, 92-1 CPD ¶ 171 ............24

*OTI America, Inc.* v. *United States*, 68 Fed. Cl. 646 (2005) .............................................28

*Overstreet Electric Co.* v. *United States*, 47 Fed. Cl. 728 (2000) ......................................1

*PHT Supply Corp.* v. *United States*, 71 Fed. Cl. 1 (2006) ................................................22

*Tri-State Gov't Servs.*, B-277315.2, Oct. 15, 1997, 97-2 CPD ¶ 143 ................................24

*Universal Yacht Services, Inc.*, B-287071, 2001 Comp. Gen. Proc. Dec. ¶ 74 (Apr. 4, 2001) ..........................................................................................22, 24

### STATUTES

10 U.S.C. § 2305(b)(1) ..........................................................................................21

48 C.F.R. § 1.06 ..................................................................................................11

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 08-101C<br><br>Protected Information To Be Disclosed Only In Accordance With the U.S. Court Of Federal Claims Protective Order |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Plaintiff L-3 Global Communications Solutions, Inc. ("L-3 GCS"), by its undersigned counsel, respectfully submits this Opposition to Defendant's Cross Motion for Judgment Upon the Administrative Record and its Reply to Defendant's Response in Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record.

**PRELIMINARY STATEMENT AND STATEMENT OF ISSUES**

This is a remarkably simple case. There are only two issues presented:

1. Did the solicitation contain a mandatory requirement for the utilization of Stratos as the Land Earth Station Operator ("LESO") for Fleet-55 terminals?

2. Did ADCI of Delaware, LLC ("ADCI"), the Awardee, propose and intend to provide Stratos for the Fleet-55 terminals?

With respect to the first question, the Agency admits that Stratos was the mandatory LESO. *See* Defendant's Cross Motion for Judgment Upon the Administrative Record and

Response in Opposition to Plaintiff's Motion for Judgment Upon the Administrative Record (hereinafter "Coast Guard Brief") at 12:

> [W]e do not dispute that the RFQ required the Offerors to provide Stratos as the LESO, AR 79, 92.

Because the first issue has been unambiguously conceded, no further discussion is required.

The Agency contends that the second issue is in dispute but the administrative record unambiguously and indisputably establishes that ADCI did not propose and did not intend to provide Stratos for the Fleet-55 terminals. Although this case is subject to the lower evidentiary standard of Rule 52.1, the administrative record in this case is so strong that Plaintiff would be entitled to summary judgment under Rule 56 because there is no genuine issue of material fact. Everything in the administrative record consistently and uniformly demonstrates that ADCI based its proposal upon an indisputable intention to utilize Telecom Italia rather than Stratos for the Fleet-55 terminals.

Despite the clear demonstration that ADCI submitted a non-compliant proposal, the Agency became obsessed with the percent price advantage created by the utilization of Telecom Italia and actively worked hand in glove with ADCI to implement the non-compliant proposal until the scheme was brought to a halt by the filing of this protest.

It is axiomatic that a non-compliant proposal cannot be accepted and that any award made to a non-compliant proposal is invalid. No amount of post-award machination by the Offeror or the Agency can cure the non-compliance and this protest must be sustained.

## ARGUMENT

### A. The Award To ADCI Is Unlawful Because ADCI Did Not Propose Or Intend To Provide Stratos As The Mandatory LESO

Plaintiff's Opening Brief at 2-16 demonstrated that the ADCI proposal utilized Telecom Italia rather than Stratos as the LESO. The Coast Guard's Brief neither refutes nor even

addresses Plaintiff's demonstration from the administrative record. The Coast Guard's reluctance to address the administrative record is understandable, but this Court has a duty to examine the facts that the Coast Guard would rather ignore. Unambiguously, consistently, overwhelmingly, and repeatedly, the administrative record demonstrates that ADCI did not propose and did not intend to provide Stratos for the Fleet-55 terminals.

On January 4, 2008, Paul Searles (Coast Guard) wrote to Sonia Kendall (Coast Guard) to forward the message of Doug Thomas (ADCI) that the ADCI proposal had been based on utilization of Telecom Italia rather than Stratos for Fleet-55 terminals:

> Hey Sonia:
>
> Doug has been trying to link up with you over the phone. No success. He passes on the following.
>
> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR zone boats/terminals will have to program "555" [Telecom Italia] instead of "013" [Stratos] as the LES they use when conducting comms. It is the LES for TI (Telcom Italia). AR 334

On the same day, Sonia Kendall replied:

> Nice to see this 'after the contract is awarded' information coming out of the woodwork! AR 336.

By January 18, 2008, the Coast Guard had met face to face with ADCI representatives and confirmed that ADCI had not proposed or intended to provide Stratos:

> Regarding the bad news Airtime Kickoff mtg [with ADCI] yesterday . . . ADCI's bid is based on using Tel-Italia, whose LES is in Fachino, Italy. AR 349.

The Coast Guard continued to document the fact that ADCI had not proposed or intended to provide Stratos and further circulated the information inside the Agency. On January 18, 2008, Sonia Kendall wrote:

> We were informed by Doug Thomas, ADCI, a few weeks ago that our cutters will have to change their dialing procedures, which included dialing into a new Land Earth Station, which are owned by Telecom Italia. AR 350.

Ms. Kendall continued:

> Unfortunately, the prices that Doug [Thomas of ADCI] quoted in the RFQ responses was based on the rate he could give us using Telecomm Italia services. AR 350.

Ms. Kendall concluded:

> ADCI should have mentioned the technical changes that they were going to require as a part of the contract, if awarded to them, when they responded to the RFQ. None of us [on the evaluation team] thought of asking about the terrestrial connectivity services since they had always used Stratos in the past. AR 350.

The Contracting Officer, Walt O'Brien responded to Ms. Kendall as follows:

> In a nutshell it appears that both the contractor and the program office made unspoken assumptions that were incorrect. AR 357.

On January 22, 2008, Paul Searles wrote to further explain the non-compliant proposal and the technical incompatibilities caused by it:

> This was precipitated by our meeting with Doug Thomas (ADCI) late Thursday. Apparently, he had bid the contract with a technically non-viable solution, but did not reveal the details to us until last Thursday's meeting. His intentions were good in saving the CG a good deal of money, but the technical solution precluded the CG terminals from hooking up with our own Coast Guard Data Network! . . . The bottom line is all of our Fleet-55 terminals are going back to DITCO until this mess gets cleared up. It may take a major rebid of the contract. AR 361.

Thomas Stewart (Coast Guard) responded to the Searles information on February 4, 2008:

> I apologize for not seeing this in time to stop ADCI . . . I met with ADCI several times to discuss this. Technically what they are saying can be done. IMHO [in my humble opinion] it probably isn't worth the effort for several reasons. AR 387.

On February 5, 2008, Evaluator Paul Vogel further explained:

> That figure [compared to L-3 GCS] is a figure ADCI threw out there because with Tele Italia they were able to bid about less per unit of F55 ISDN and approx. less for MPDS than we're currently paying. AR 396.

Mr. Vogel continued:

> We ordered up 800,000 minutes of ISDN on the first task order for this FY off the BPA, that was before ADCI dropped the bomb on LES [Land Earth Station] shift. AR 396.

On February 11, 2008, Sonia Kendall prepared a memorandum for circulation internally at the Coast Guard, which summarized the Agency's accumulated knowledge:

> The Coast Guards contract for the supply of Inmarsat airtime services was recently awarded under BPA HSCG23-08-A-TMM001 to ADCI of Delaware, LLC. This contract requires the use of Telecom Italia as the Inmarsat Land Earth Station/Inmarsat Distribution Partner for the provision of the Fleet 55 airtime section. AR 402.

Ms. Kendall's memorandum continued:

> To lower overall airtime charges the ADCI contract requires the use of Telecom Italia for routing all Fleet 55 services. Technically this is possible, but when the RFP was issued and further clarified when packaged with vendor Questions and Answers, the Coast Guard clarified that the existing LES [Stratos] must be the termination point. AR 402.

Finally, on February 28, 2008, nearly a week after the filing of the L-3 GCS protest, Paul Searles released a time line of events again confirming that ADCI had proposed and intended to use Telecom Italia "in order to take advantage of the lower airtime costs." AR 418. The time line contained the following entry:

> FRI 04 JAN - Received a phone call from Doug Thomas (ADCI) stating he'd been attempting to get in touch with LT Kendall (CG 62) for several days, and he needed to urgently speak with her. He passed the information intended for LT Kendall to me (PBS) regarding the need for CG vessels to use the LES Code 555 (relevant to AOR & IOR only at this point) as their default in order to take advantage of the lower airtime cost (nearly 22 percent less than previous normal level). I immediately drafted the info in an email and sent to LT Kendall (~ 3:49 p.m.); she responded ~ 6:22 p.m. same day . . . AR 418.

Because ADCI had proposed and insisted on providing Telecom Italia, and because the Coast Guard was discovering that Telecom Italia was incompatible with the existing Coast Guard network, the Coast Guard's transition plan was thrown into turmoil. On January 14, 2008, Mr. Searles had to cancel all of the transitions he had begun for transfer of Fleet-55 terminals to ADCI:

> New contractor's solution was insufficient to meet the technical requirement. Restoring to DITCO mgmt. AR 250, 260, 263, 266, 269, 272, 275, 277, 280, 283, 286, 288, 291 and 297.

Mr. Searles also advised L-3 GCS on January 17, 2008, that the transitions could not proceed and that L-3 GCS, as the incumbent contractor, would need to continue servicing the Fleet-55 terminals:

> Please be advised that the -30 discontinue TSR's I submitted in the middle of December need to be reversed. The contract that was renewed, originally forcing the terminals to be shifted from DITCO, fell through because of a technical incompatibility. AR 342.

On January 22, 2008, Mr. Searles wrote to Stratos explaining that:

> The bottom line is that all of our Fleet-55 terminals are going back to DITCO until this mess gets cleared up. It may take a major rebid of the contract. AR 361.

Finally, Mr. Searles' time line contained the following entry:

> THU 17 JAN 1400 - TISCOM hosted a meeting with ADCI (Doug Thomas), CG-62 (LT Kendall - mtg scheduler). TISCOM attendees were LCDR Vogel, Tom Stewart, Rick Sozzi, and Paul B. Searles. Outcome of the meeting determined ADCI's technical solution (using TI's 555 LES code) was not able permit the CG Cutters access to the CGDN. CG-62 and LCDR Vogel agreed I must move the terminals back to DISA/DITCO management until problems were resolved. ADCI's Doug Thomas was to make a trip to visit Telecom Italia the following week to discuss the technical issues/options. AR 419.

Every act and every statement found in the administrative record is consistent. ADCI did not propose and did not intend to provide Stratos for the Fleet-55 terminals. Instead, ADCI flatly

told the Coast Guard it would have to use Telecom Italia "in order for us to get the great rates on the Fleet-55's quoted in the new contract." AR 334. ADCI continued its refusal to provide Stratos despite the chaos of forcing the Fleet-55 terminals back through DITCO and into management by L-3 GCS, the previous incumbent contractor.

The most gentle but most damning words were those of the Contracting Officer, Mr. Walt O'Brien, who said that:

> In a nutshell, it appears that both the contractor and the program office made unspoken assumptions that were incorrect. AR 357.

Mr. O'Brien's phrasing is more gentle than that used by others when they discovered that ADCI had submitted a non-compliant proposal, but the result is the same. The Coast Guard had "unspoken assumptions" in thinking that ADCI had proposed Stratos, but ADCI had not done so and, as the record demonstrates, never intended to do so. The ADCI proposal was non-compliant, the award is invalid, and the protest must be sustained.

### B. The "Artfully Drafted" ADCI Proposal Contained No Enforceable Promise To Supply Stratos For The Fleet-55 Terminals

ADCI submitted its proposal on November 2, 2007. AR 100. RFQ Amendment #8 altered some of the revised quantities and ADCI submitted its revised proposal on November 29, 2007. AR 107. Other than accommodating the changed quantities, there were no differences between the initial ADCI proposal on November 2, 2007 and the final ADCI proposal on November 29, 2007. The ADCI technical proposal consisted of a single page that was identical on both November 2 and November 29. AR 100, 107.

With respect to the mandatory requirement for the provision of Stratos for the Fleet-55 terminals, the ADCI proposal is carefully and pointedly silent. The only reference to Stratos in the entire ADCI proposal is the statement that:

AR 100, 107.

This is a clever application of the longstanding legal doctrine of *inclusio unius est exclusio alterius*. No one could ever say that ADCI's statements included the provision of Stratos for the Fleet-55 terminals. At the same time, ADCI remained easily able to say to the Coast Guard after contract award that its proposal included Stratos for the Mini-M terminals, but excluded Stratos for the Fleet-55 terminals. As seen above, this is exactly what ADCI did.

The only other statement in the ADCI proposal with any relevance to the current dispute is the statement that:

AR 100,

107.

Note that this is a statement of capacity (ADCI "can"), not a statement of commitment (ADCI "will"). Nothing on the face of the ADCI proposal indicates that ADCI understood that Stratos was a mandatory requirement for the Fleet-55 terminals, and nothing on the face of the ADCI proposal says that ADCI is proposing or intending to provide Stratos for the Fleet-55 terminals.

To the contrary, the administrative record references cited above make it indisputably clear that ADCI did not propose and did not intend to provide Stratos for the Fleet-55 terminals when it submitted its proposal. If the Government were ever to try to litigate to force ADCI to provide Stratos for the Fleet-55 terminals, the Government would lose. ADCI would simply trot out its cost buildup spreadsheets, and the many Government records acknowledging that ADCI had priced Telecom Italia in its proposal (AR 334, 349, 350, 357, 361, 387, 396, 402 and 418). ADCI would also cite to the fact that it had never even contacted Stratos to discuss Fleet-55 terminal services. AR 414.

All of this was obvious to L-3 GCS immediately upon learning the price that had been proposed by ADCI. L-3 GCS instantly knew that the price proposed by ADCI meant that ADCI had not proposed or intended to provide Stratos for the Fleet-55 terminals. This was precisely the point that L-3 GCS made to the Coast Guard in the December 20, 2007, debriefing. As stated in the declaration of Jeff Meyers which has been admitted as a part of the administrative record in this matter:

> During the debriefing, L-3 GCS explained to the Coast Guard that L-3 GCS was acutely aware of industry pricing and that it seemed highly unlikely that ADCI could beat the L-3 GCS price unless ADCI submitted its bid with the intention to deliver an airtime services provider other than STRATOS.
>
> In particular, L-3 GCS specifically placed the Coast Guard on notice of the L-3 GCS' concerns that ADCI either had misled the Coast Guard into thinking that it intended to provide Stratos or had concealed their intent to provide an airtime services provider other than Stratos. Declaration of Jeff Meyers from April 24, 2008 ("Myers Decl."), ¶¶ 15 and 16, AR Tab 26.

Despite being explicitly placed on notice as to exactly what had happened in this case, the Coast Guard did nothing and proceeded to implement the non-compliant proposal until January 4, 2008 (AR 334) when ADCI "dropped the bomb" (AR 396) that the L-3 GCS warning had been absolutely correct and that ADCI neither proposed nor intended to provide Stratos for the Fleet-55 terminals.

In addition to submitting pricing and other proposal elements, the solicitation affirmatively required offerors to reveal:

> Any other relevant information to include exceptions/assumptions related to this RFQ. AR 53.

ADCI did not comply with the requirement to reveal its exceptions and assumptions in connection with its proposal to utilize Telecom Italia for the Fleet-55 terminals. Instead, as the Contracting Officer himself admits:

> In a nutshell it appears that both the contractor and the program office made unspoken assumptions that were incorrect. AR 357.

The solicitation had safeguards to protect the Government against the sort of sleight of hand practiced by ADCI here. With respect to the required proposal contents, including the obligation to reveal the offeror's exceptions and assumptions, the RFQ stated:

> If the quote is not submitted with the above information, the Government may consider the quote as non-responsive, and may be eliminated from further consideration for award. AR 53.

The reasons for the protective language are entirely obvious. The Government places offerors on notice that a non-compliant proposal cannot form the basis for a valid award. The Government can and must reject a non-compliant proposal, particularly a proposal that furthers the impropriety by concealing or misleading the offeror's true intentions. As Evaluator Sonia Kendall wrote after learning of the non-compliance:

> ADCI should have mentioned the technical changes that they were going to require as a part of the contract, if awarded to them, when they responded to the RFQ. None of us thought of asking about the terrestrial connectivity services since they had always used Stratos in the past. AR 350.

This is exactly the point. It does not matter whether ADCI willfully concealed critical details of its proposal or whether the Coast Guard negligently failed to inquire. All that matters is the indisputable fact that the ADCI proposal was non-compliant, that the award was invalid and that the protest must be sustained.

### C. The Coast Guard Worked Assiduously To Implement The Non-Compliant Proposal

Up to this point, the discussion has been very ordinary and not the sort of thing that requires a protest. The usual course is that the agency simply takes voluntary corrective action when it discovers it has made an invalid award to a non-compliant proposal. The Coast Guard, instead, became absolutely mesmerized by the percent price advantage resulting from the

non-compliant utilization of Telecom Italia for the Fleet-55 terminals and began a months-long effort to assist ADCI in implementing the non-compliant proposal. As explained at pages 7-16 of Plaintiff's Opening Brief, the Coast Guard made clear not only its willingness to accept the non-compliant proposal, but also became increasingly active in helping ADCI look for ways to implement the non-compliant proposal as technical difficulties became apparent. This effort culminated with the Contracting Officer himself contacting Stratos in an effort to develop a mechanism whereby Stratos would not be the service provider but would, instead, be a mere conduit for services provided by Telecom Italia:

> Ms. Hochberg [Stratos],
>
> I am the U.S. Coast Guard Contracting Officer for a procurement with the ADCI Corporation to provide Airtime Services to the Coast Guard. Under that procurement our Contractor has suggested using a T1 communications line from a Telecom Italia facility directing into your facilities in New York (to be provided by the Contractor itself or by the Coast Guard) as a pipeline for the flow of information to Coast Guard systems centers. I wanted to inquire as to whether this is acceptable to your company. We are still working out details with our Contractor and this information will be helpful in our decision as to the best course of action for the Coast Guard. AR 414.

Rather than struggle to assist ADCI in implementing the non-compliant proposal, with all of its technical problems, the Contracting Officer should have canceled the award:

> Contracting officials have a duty both to safe guard the interests of the United States and to protect the integrity of the procurement process. 48C.F.R. § 1.06. When a contracting official discovers an impropriety after an award has been made, the official may terminate the contract and exclude the awardee from further participation in the procurement.

PPATHI, Inc. B-249182.4, 1993 U.S. Comp. Gen. LEXIS 69 (January 26, 1993).

The non-compliant ADCI proposal was ineligible for award, the invalid contract must be terminated and the protest must be sustained.

### D. The Administrative Record Contains No Support For the Coast Guard Position

The Court will have noticed that the Coast Guard has neither refuted nor even addressed the factual demonstration set forth in Plaintiff's Opening Brief at pages 2-16. That factual demonstration and the further demonstration set forth above conclusively establish that ADCI did not propose and did not intend to propose Stratos for the Fleet-55 terminals. To maintain its position, the Coast Guard is reduced to ignoring most of the record and to misconstruing a few small, remaining slivers.

The Agency offers two thin arguments to contend that the record supports a finding that the ADCI proposal was compliant. The Agency argues first that this was all a big misunderstanding because ADCI did intend to provide Stratos and only mentioned Telecom Italia as a possible unsolicited change proposal after contract award. The Agency argues second that ADCI did provide Stratos for three Fleet-55 terminals for a brief period of time, but the actual record with respect to those few exceptions demonstrates that ADCI offered this small body of service only as a special, temporary and limited dispensation from its proposal and intention to utilize Telecom Italia rather than Stratos. Neither of the Agency claims has merit.

#### 1. The Claim That ADCI Proposed Stratos But, After Contract Award, Submitted An Unsolicited Change Proposal To Utilize Telecom Italia

The Coast Guard Brief contains an almost bewildering array of variations on assertions about the "Coast Guard's consideration of ADCI's post-award proposal." *See, e.g.*, Coast Guard Brief at 19. In all, Plaintiff's counsel identified 54 repetitions of the claim that ADCI made an unsolicited change proposal in early January 2008 to substitute Telecom Italia after previously

having proposed and intended to provide Stratos.[1] Frequency of a claim, however, is not the same as demonstration of merit. Indeed, the striking thing about the 54 references to an "early January 2008 proposal" is that none of them quote that alleged "proposal" or identify its terms. In truth, the record establishes just the opposite of what the Coast Guard claims.

The Coast Guard does not quote any language from the administrative record to support its theory that ADCI submitted a compliant proposal that was followed by a post-award unsolicited change proposal. The Agency does, however, list three places in the administrative record (AR 300-01, 334 and 350) where it asserts that such a post-award proposal might be found. Coast Guard Brief at 6. Actual review of these three locations, however, reveals that none of them provide any support whatsoever for the Agency's theory and, indeed, all three are documents that have been both referenced and extensively quoted by Plaintiff.

The first alleged location of the "early January 2008 proposal," AR 300-301, is actually a February 4, 2008 memorandum from ADCI which purports to address some of the technical problems the Agency had, by this time, discovered in the original non-compliant proposal. This February 4 document came after the January 29, 2008, "emergency meeting" that had been called to demand answers to some of the technical problems created by the non-compliant original proposal. AR 369, 372 and 384. The Coast Guard immediately recognized that the February 4 report had not solved any of the technical compatibility issues raised by the non-compliant proposal:

> Their response is in the simplest form and really only talks about clouds, not the technical details or the pricing on what the second terrestrial buildout [to work around the failure to utilize Stratos] is going to cost. . . . Why would we even consider trying to pay for and support two terrestrial networks? AR 396.

---

1 *See*, *e.g.*, Coast Guard Brief at 1, 2, 4, 6, 7, 8, 9, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27. Many pages have multiple repetitions of the claim.

The history of all of these events, including the February 4, 2008, report, is set forth at pages 8-16 of Plaintiff's Original Brief.

The second document cited by the Coast Guard as the potential location for the claimed post-award unsolicited change proposal is AR 334. This document, however, is the January 4, 2008, email from Paul Searles memorializing the statement from Doug Thomas of ADCI that:

> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR Zone Boats/Terminals will have to program "555" [Telecom Italia] instead of "013" [Stratos] as the LES they use when conducting comms. It is the LES for TI (Telecom Italia). AR 334.

As demonstrated by Plaintiff, this was not an offer to reduce prices if the Agency would accept a post-award unsolicited change proposal. Rather, this was a statement by ADCI that the use of Telecom Italia was already priced into and was the basis for the original non-compliant proposal.

The third potential location selected by the Agency for the claimed post-award unsolicited change proposal is AR 350. That document also is unavailing as demonstrated by Plaintiff above and actually states:

> Unfortunately, the prices that Doug [Thomas of ADCI] quoted in the RFQ responses was based on the rate he could give us using Telecom-Italia services . . . ADCI should have mentioned the technical changes that they were going to require as a part of the contract, if awarded to them, when they responded to the RFQ. None of us thought of asking about the terrestrial connectivity services since they had always used Stratos in the past. AR 350.

There is a considerable audacity in claiming that ADCI made a compliant proposal that offered and intended to utilize Stratos, but later came in with an unsolicited change proposal when the actual record is so directly and profusely contrary. The Court is familiar with the usual procedure for unsolicited change orders: (1) a compliant proposal is submitted; (2) compliant performance begins; (3) the contractor identifies a cost-saving alternative; and (4) the contractor

submits an unsolicited change proposal to split with the Government the economic benefit from the savings. *See, e.g.*, FAR Subpart 48.1. None of that occurred here.

The record is replete with unambiguous proof that ADCI proposed and intended to perform with Telecom Italia and began performance by implementing that pre-award intention. There is nothing in the record to suggest that ADCI discovered Telecom Italia on a post-award basis and brought it forward in an unsolicited change proposal to reduce the previously quoted price to the Coast Guard. To the contrary, the uncontradicted record is that ADCI proposed and intended to utilize Telecom Italia from the start "[i]n order for us to get the great rates on the Fleet-55's quoted in the new contract." AR 334. The claim that, "[i]n early January 2008, ADCI proposed to use Telecom Italia" (Coast Guard Brief at 6) is flatly contradicted by the record which demonstrates that January 4, 2008, was simply the day on which the Coast Guard confronted the "unspoken assumptions" (AR 357) underlying the fact that ADCI had based its proposal and pricing upon the provision of Telecom Italia rather than Stratos.

Although the claim of a post-award unsolicited change proposal is made 54 times in the Coast Guard's Brief, there is one place where the Coast Guard abandons this argument to say that the award should be allowed to stand because the Coast Guard did not know of ADCI's intentions at the time of award:

> The administrative record shows that the Coast Guard was not aware of ADCI's proposal to use Telecom Italia until after the award of the BPA on November 30, 2007. On January 4, 2008, in response to an e-mail notification that ADCI's customer liaison, Doug Thomas, was trying to reach the Coast Guard to tell it to use Telecom Italia as the LESO for the Fleet 55 terminals, one of the BPA's technical evaluation team responded: Nice to see this 'after the contract is awarded' information coming out of the woodwork! AR 336. Coast Guard Brief at 14.

The above passage is remarkable and demonstrates the lack of merit in the claim that there was an unsolicited post-award change proposal. In the Coast Guard's own words, "Doug

Thomas, was trying to reach the Coast Guard to tell [not "ask" or "suggest" or "propose"] it to use Telecom Italia." As the Coast Guard itself then acknowledges, the January 4 message was really a belated announcement of what ADCI's original proposal contained rather than an unsolicited post-award change proposal to alter the original proposal:

> Nice to see this 'after the contract is awarded' information coming out of the woodwork! AR 336; Coast Guard Brief at 14.

The ADCI proposal was non-compliant, the award was invalid, and the protest must be sustained.

**2. The Claim That Early Performance Demonstrates ADCI's Proposal And Intention To Utilize Stratos For The Fleet-55 Terminals**

On pages 6, 8 and 18 of the Coast Guard Brief, there are fleeting suggestions that ADCI must have proposed and intended to provide Stratos because:

> In fact, the record demonstrates that ADCI was using Stratos as the LESO during the first two months of the December 2007 task order. Coast Guard Brief at 18.

There is a reason for the Coast Guard's decision to give only fleeting reference to this last factual argument. The reason is that the administrative record conclusively demonstrates that the few terminals for which ADCI gave short-term service under Stratos were exceptional, temporary dispensations that ADCI allowed only under protest as being contrary to its original proposal and intention to utilize Telecom Italia.

Most of the Fleet-55 terminals operated by the Coast Guard were already operational at the date of the award of this contract. These terminals were serviced by L-3 GCS through DITCO. All of these terminals needed to be transitioned from L-3 GCS to the new contract awardee. Mr. Paul Searles (Coast Guard) attempted to begin the transition of these existing terminals. AR 327-331 and 419. Although the transition of these terminals began, it had to be

cancelled on January 14, 2008, because ADCI would not permit transition to Stratos and insisted on transition to Telecom Italia:

> Cancel requirement in its entirety. New contractor's solution was insufficient to meet the technical requirement. Restoring to DITCO mgmt. AR 250, 260, 263, 266, 269, 272, 275, 277, 280, 283, 286, 288, 291, 294 and 297.

While ADCI refused to permit transition of the bulk of the Fleet-55 terminals to Stratos, there were three terminals that were handled differently. Unlike the bulk of the terminals which had to transition in coordination with DITCO from L-3 GCS over to ADCI (a slow process), the three terminals for new services came online in December 2007. AR 327-331 and 419. Since no transition from L-3 GCS under the DITCO contract was necessary, Mr. Searles simply initiated Stratos service for these three new terminals under the ADCI contract <u>and received protest from ADCI</u>. AR 334.

What happened is that the three new terminals were processed to the ADCI contract and began service through Stratos while the existing terminals moved through the slower transition process of steps away from L-3 GCS, through DITCO and over to ADCI. Thus, ADCI got invoices from Stratos for three Fleet-55 terminals serviced in December 2007 as follows:

> CGC Sitkinak (AR 216)
> Drummond (AR 225)
> CGC Cuttyhunk (AR 225)[2]

When ADCI discovered that three Fleet-55 terminals were going to be invoiced to ADCI by Stratos, it reacted as memorialized in the email from Paul Searles to Sonia Kendall:

> Hey Sonia:
>
> Doug has been trying to link up with you over the phone. No success. He passes on the following.

---

[2] The Coast Guard Brief at 6 and 18, cites other invoices but those invoices do not involve Fleet-55 terminals (AR 217-224 and 226-234).

> In order for us to get the great rates on the Fleet-55's quoted in the new contract, the AOR & IOR zone boats/terminals will have to program "555" [Telecom Italia] instead of "013" [Stratos] as the LES they use when conducting comms. It is the LES for EI (Telecom Italia). . . AR 334.

Although only three Fleet-55 terminals were receiving Stratos service under the ADCI contract, ADCI objected to even this minimal bit of compliant performance and insisted that these three terminals needed to be moved away from Stratos "in order for us to get the great rates on the Fleet-55's quoted in the new contract." AR 334. Given ADCI's refusal to provide Stratos, the Agency had to work "feverishly" to unwind the three transitions that had occurred and to prevent any more from occurring:

> Unfortunately, the prices that Doug [Thomas of ADCI] quoted in the RFQ responses was based on the rate he could give us using Telecom Italia services and since we are not going to be using Telecom Italia, ADCI cannot meet the price listed in the contract . . . As of right now, TISCOM is feverishly working on getting any Fleet-55's transitioned back from ADCI back over to DITCO and stop the process of transferring any of the remaining ones that were suppose to go to ADCI. AR 350.

The question then became what to do about the costs for the three terminals that were being invoiced to ADCI until the Agency could complete its effort of "feverishly working on getting any Fleet-55's transitioned back from ADCI." AR 350. It is with respect to this very small, very limited bit of performance that ADCI agreed to grant a dispensation from the terms of its non-compliant proposal:

> Doug (ADCI) said they would pick up the two or three terminals which had made the complete transition to ADCI, until they were picked back up through DITCO's process. AR 406.

Similarly, Stratos confirmed with ADCI:

> You had committed to picking up this vessel's usage invoice (and one or two others) while the terminal was briefly in your care under the new contract, and until DITCO processed it back in. AR 406

The administrative record continues:

> The Drummond terminal is presently under ADCI & will be shifted to DITCO, post-haste. The Sitkinak is also on ADCI & will be shifted to DITCO. . . . These two were placed with ADCI on the basis of their winning the contract renewal; as explained before, that is no longer the case until either a re-bid or viable solution from ADCI is realized. They have agreed to manage the two terminals until the shift to DITCO is successful. AR 368.

When understood in context, the few terminals for which ADCI provided Stratos service during a very short period are actually the exception that proves the rule. ADCI rejected the bulk transfer of Fleet-55 Terminals to Stratos, instead insisting on transfer to Telecom Italia and, for the few terminals that were transferred to Stratos, ADCI objected. Even though ADCI had only received responsibility for three terminals under Stratos, ADCI nevertheless forced the Coast Guard to begin "feverishly working on getting any Fleet-55's transitioned back from ADCI back over to DITCO" and only reluctantly agreed to pay for the short time it had responsibility for these terminals "until DITCO processed it back in." AR 350, 406.

These are not the actions of a company that submitted a compliant proposal to provide Stratos. A company that had submitted a compliant proposal to provide Stratos would have welcomed the transition as quickly as possible for as many as possible of the Fleet-55 terminals. All of these events occurred six weeks before the filing of the L-3 GCS protest and, obviously, were unaffected by the Motion for Preliminary Injunction later filed by L-3 GCS. *See* Doc. 5. The simple fact of the matter is that it was ADCI itself that stopped the transition because it had not proposed and did not intend to provide Stratos. As explained in the February 28, 2008 timeline prepared by Mr. Searles, the transition had to be reversed because ADCI continued to insist that the Coast Guard was required to use Telecom Italia in order to get the great rates:

> THU JAN 1400 - TISCOM hosted a meeting with ADCI (Doug Thomas, CG-62 (LT Kendall-mtg scheduler). TISCOM attendees were LCDR Vogel, Tom Stewart, Rick Sozzi and Paul B. Searles. Outcome of the meeting determined ADCI's technical solution paring using TI's 555 LES code) was not able permit

> the CD cutters access to the CGDN. CG-62 . . . LCDR Vogel agreed I must move the terminals back to DIS/DITCO management until problems were resolved. ADCI's Doug Thomas was to make a trip to visit Telecom Italia the following week to discuss the technical issues/options. AR 419.

Even when faced with a collapse of the transition, ADCI would not retreat from its original position that it had proposed and intended to provide Telecom Italia "in order for us to get the great rates on the Fleet-55's quoted in the new contract." AR 334. ADCI's only concession was that Mr. Thomas would "discuss the technical issues/options during his visit to Telecom Italia the following week. AR 419.

There is nothing in the record to indicate that ADCI proposed or intended to utilize Stratos. Everything in the record consistently demonstrates ADCI's non-compliant proposal and intention to utilize Telecom Italia for the Fleet-55 terminals. The ADCI proposal was non-compliant, the award was invalid and the protest must be sustained.

### E. The Governing Legal Standard Is Simple: A Contract Awarded On The Basis Of A Non-Compliant Proposal Is Invalid

The Coast Guard does not dispute that this litigation is governed by Rule 52.1 although, as demonstrated above, Plaintiff would be entitled to summary judgment under the more stringent standards of Rule 56 because there is no genuine issue of material fact raised by the unsupported claims of the Coast Guard, all of which are directly contradicted by the undisputed factual record. Nevertheless, the Coast Guard Brief erroneously cites repeatedly to "a rational basis" standard and states that "the evaluation of technical proposals is a matter within the discretion of the contracting Agency." Coast Guard Brief at 15 and generally, at 9-16. The Coast Guard here is attempting to apply the wrong standard.

The Contracting Officer does not have "discretion" to accept a non-compliant proposal. A proposal that does not meet the mandatory requirements for award is not eligible for award and there is no discretion to shave the corners. Assuring that all competitors compete on an

equal basis is one of the most fundamental requirements of government contracting. If a Contracting Officer thinks it would be wise to accept a proposal that does not meet a mandatory requirement, it means that the requirement is not truly mandatory and the Contracting Officer has an obligation to amend the solicitation and allow all offerors to compete on the new basis. The Contracting Officer cannot exercise "discretion" to simply accept the non-compliant offer. *See, e.g., Alfa Laval Separation Inc.*, 175 F.3d 1365 (Fed. Cir. 1999) (award to proposal that did not comply with mandatory requirements violates applicable procurement statutes and regulations); *Mangi Envtl. Group, Inc. v. United States,* 47 Fed. Cl. 10, 15 (2000) ("Clearly, SRI's proposal failed to conform to the material terms and conditions of the solicitation. As a result, this court is constrained to find a clear violation of a procurement statute and regulation because the proposal should not have been considered for contract award.). As explained in *Beta Analytics Int'l, Inc. v. United States*, 44 Fed. Cl. 131, 138-39 (1999):

> The Appeals Court explained that procuring officials' views regarding the appropriateness of standards set forth in the solicitation cannot relieve the Agency from mandatory terms of the solicitation. *See* 10 U.S.C. § 2305(b)(I)(1994) ("The head of an Agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). Thus, if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award. . . The dispositive issue is not whether HSI's proposal was reasonable, but whether it complied with the mandatory requirements of the solicitation.

As with the current case, a non-compliant proposal cannot be saved by stretching the administrative record:

> The [Agency's] attempted explanations were either totally off the mark or involved contorting the language of Daktronics' offer. Daktronics' quotation thus failed to comply with two mandatory specifications.

*Meir Dubinsky v. United States*, 44 Fed. Cl. 509, 512 (1999).

The reason for the rule is well-established in all of the adjudicatory bodies that handle bid protests whether it is the Court of Appeals for the Federal Circuit, this Court, the General Accounting Office, or, formerly, the United States District Courts and the General Services Board of Contract Appeals. *See, e.g., E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (In negotiated procurements, a proposal that fails to conform to the material terms and conditions of the Solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.)

As stated most recently, in a General Accounting Office decision in the Boeing matter:

> It is a fundamental principle in a negotiated procurement that a proposal that fails to conform to a material solicitation requirement is technically unacceptable and cannot form the basis for award.

The Boeing Company, B-311344, June 18, 2008 at page 33 of redacted version, www.gao.gov/decisions/bidpro/311344. *See also, PHT Supply Corp. v. United States*, 71 Fed. Cl. 1, 19 (2006) (same); *Universal Yacht Services, Inc.*, B-287071, 2001 Comp. Gen. Proc. Dec. ¶ 74 (Apr. 4, 2001) ("It is well-settled that, in a negotiated procurement, a proposal that fails to conform to one or more of the solicitation's material requirements is technically unacceptable and cannot form the basis for an award").

The award to the non-compliant ADCI proposal in this case violates several of the most fundamental principles of government contracting. If a solicitation lists a requirement as mandatory, it is mandatory for all bidders. Agencies have an obligation to make awards only to offers that comply with the requirements of the solicitation. Agencies must maintain the integrity of the procurement process, avoiding both improprieties and the appearance of improprieties.

Different phrasing is sometimes used in reaching the conclusion that an Agency has violated its obligations. Sometimes, the selection of a non-compliant proposal is described as a defective evaluation. Sometimes, it is described as an improper waiver of a specification. Sometimes, it is described as a case of unequal treatment of offerors. Plaintiffs have alleged all of this in their complaint, and have recited appropriate case law in their Opening Brief which need not be repeated here.

Recognizing that its claim that ADCI submitted a compliant proposal is entirely contradicted by the record, the end of the Coast Guard Brief switches to an "Even if ADCI intended to use another LESO when it made its proposal" argument. Coast Guard Brief at 22. The argument here is that the original non-compliant proposal should be resuscitated because, on February 29, 2008, ADCI allegedly agreed to comply with the requirements of the RFP.[3] Coast Guard Brief at 7, 22-25. The Coast Guard states:

> On February 29, 2008, ADCI stated to the Contracting Officer via telephone that it would use Stratos for the Fleet-55 terminals, which it later confirmed in writing. AR 302, 424(i).

Coast Guard Brief at 7.

---

3 The Agency also contends that it subsequently received a written confirmation of ADCI's willingness to provide Stratos for the Fleet-55 terminals. Coast Guard Brief at 7, citing AR 424(i). While unnecessary to the result here, Plaintiff notes that the cited document, AR 424(i) says in its entirety:

> ADCI will continue to provide Inmarsat airtime billing services utilizing the Stratos LES, under BPA No. HSCG-23-08-A-TMM001; and Task Order No. HSCG-23-08-F-TMM002.

This document only says that ADCI will "continue" to do whatever it had done before. This included providing Stratos for the Mini-M terminals but not for the Fleet-55 terminals. Even if a late amendment could cure a non-compliant proposal, Document 424(i) does not provide such a cure and does not promise Stratos for Fleet-55 terminals. It is simply another artful dodge by ADCI.

This is a common response from agencies that have accepted a non-compliant proposal either intentionally or unwittingly. Such agencies mistakenly assume that an invalid award can be resuscitated *nunc pro tunc* by getting the contractor to make a late amendment to its proposal that allegedly cures a prior non-compliance. Such was the thinking inside this Agency as Ms. Kendall wrote upon hearing of ADCI's new position:

> Also, I imagine this also puts an end to L-3's contract protest since ADCI has determined that they will perform the services. AR 421.

As explained in Plaintiff's Opening Brief, however, agencies that attempt to resuscitate a non-compliant proposal through an untimely amendment are always disappointed. Plaintiff's Opening Brief at 15-16. The case law is uniform. Typical of these cases is *Martin Marietta Corp.*, B-233742.4, 90-1 Comp. Gen. Proc. Dec. ¶ 132 (Jan. 31, 1990):

> The fact that Honeywell proposed to supply the full extent of the required multi-tasking capability for the work station (including software) months after award did not render its proposal acceptable.

*Id.* at 4.

Among the other cases reaching the same result are *Universal Yacht Servs Inc.*, B-287071, 2001 Comp. Gen. Proc. Dec. ¶ 74, (Apr. 4, 2001) ("[T]he fact that the awardee may, after award, agree to be bound by the solicitation's material requirements does not render the proposal acceptable or the award proper"); *Tri-State Gov't Servs.*, B-277315.2, Oct. 15, 1997, 97-2 CPD ¶ 143 at 4 (same); *Multi-Spec Products Group Corp.*, B-245156.2, Feb. 11, 1992, 92-1 CPD ¶ 171 at 3 (same).

The reason for the rule is obvious. In order to treat all offerors equally, there must be a common cut off date for proposals and amendments. Any other rule would undermine the integrity of the procurement process by creating the potential for corruption or actual corruption as explained in Plaintiff's opening brief at 16.

The ADCI proposal was non-compliant, the invalid award must be cancelled, and the protest must be sustained.

**F. The Claim That The Coast Guard "Did Not Know" About The Non-Compliance Is Unavailing**

At various places throughout the Coast Guard Brief (*e.g.*, 8, 12, 13 and 14), it is alleged that the Coast Guard did not know about the non-compliance at the time of award. For example, page 13 of the Coast Guard Brief states, "L-3 GCS has not pointed to any evidence in the administrative record that demonstrates that the Coast Guard knew, at the time of award, that ADCI's proposal did not provide Stratos service, or that ADCI intended not to provide Stratos as the LESO for Fleet-55 airtime service." Coast Guard Brief at 13.

Statements of this sort are an attempt to suggest that Plaintiff has the burden of establishing a knowing violation by the Coast Guard at the time of award. No authority is cited for this proposition, and the Court knows full well that no such burden exists. As the cases previously cited by Plaintiff demonstrate, a non-compliant proposal cannot form the basis of a valid award and it does not matter when the non-compliance is discovered. *See, e.g., Alfa Laval Separation Inc.; Beta Analytics Intl., Inc., Mangi Envt'l. Group; Meir Dubinsky; Martin Marietta Corp., Universal Yacht Servs. Inc.; Tri-State Gov't Servs.;* and *Multi-Spec. Products Group Corp., supra.*

It often happens that an agency does not realize that a proposal is non-compliant and it is only through the bid protest process that the non-compliance is demonstrated. Contrary to the suggestion in the Coast Guard brief at 24 that such protests are "perilously close to engaging in outright contract administration," this is not a matter of contract administration. It is simply a matter of the administrative record demonstrating the ADCI submitted and the Coast Guard accepted a non-compliant proposal.

Any other rule would invite chaos and destroy the integrity of the procurement process. It would be unthinkable that an offeror should become the holder of a valid contract simply if he succeeds in hiding his non-compliance until the award is made. Similarly, it is unthinkable to suggest a rule that would undermine agency integrity by saying that an agency can accept a non-compliant proposal simply by avoiding "knowledge" of the non-compliance prior to award.

In this case, there is proof that ADCI was not candid about its proposal and intention to utilize Telecom Italia. *See, e.g.*, Plaintiff's opening brief at 4-6; and above at Parts A and B. Similarly, there is proof that the Agency failed to exercise proper diligence in evaluating the shockingly vague ADCI proposal:

> None of us thought of asking about the terrestrial connectivity services since they had always used Stratos in the past. AR 350.

While both of these factors may help explain how the Agency ended up accepting a non-compliant proposal, neither of these factors is essential to the ruling in this protest. The protest must be sustained simply because a non-compliant proposal cannot form the basis of a valid contract award. *See, e.g., Alfa Laval Separation Inc., E.W. Bliss; Mangi Envt'l. Group; Beta Analytics; supra.*

### G. L-3 GCS Was Prejudiced By The Acceptance Of The Non-Compliant Proposal

The Coast Guard makes the argument that L-3 GCS was not prejudiced because there has now been an assertion that ADCI will perform the contract as required by the RFQ. Coast Guard Brief at 22-25. The Agency's argument is, again, incorrect.

A non-compliant proposal cannot form the basis for a lawful contract award. The latest date on which ADCI could have submitted a compliant proposal was November 30, 2007. AR 81. By the Agency's own admission, ADCI did not express a willingness to provide Stratos for the Fleet-55 terminals until at least February 29, 2008. Coast Guard Brief at 7. Even if the

alleged February 29 telephone call to the Contracting Officer could be viewed as a proposal amendment, it comes three months too late and cannot cure the deficiencies in the original non-compliant proposal.

Because the ADCI proposal was non-compliant, the Agency was required to reject it. The Agency is required to cancel the invalid contract that was based upon the non-compliant proposal. If the Agency had done either of these things, it is undisputed that L-3 GCS was next in line for award and would have received the contract. AR 182. Accordingly, L-3 GCS was prejudiced by the Coast Guard failure to reject the non-compliant proposal and by the Coast Guard failure to cancel the invalid contract based upon the non-compliant proposal.

### H. L-3 GCS Has Established Its Entitlement To Injunctive Relief

In its complaint, L-3 GCS requests, among other relief, "a permanent injunction enjoining Defendant from permitting ADCI to begin or continue performance under the Contract, and ordering Defendant to terminate the Contract awarded to ADCI under the RFQ." Doc. 1, Complaint at 12. As demonstrated herein, L-3 GCS has established the merits of its position, not only under the standards of Rule 52.1, but also under the more stringent standard of Rule 56 because there is no genuine material issue of fact that would prevent a finding that the ADCI proposal was non-compliant. *See supra* Parts A-I. Accordingly, L-3 GCS has prevailed and established its success upon the merits.

In addition to proving success on the merits, L-3 GCS has established: "(1) that it will suffer irreparable harm if injunctive relief is not awarded; (2) that granting relief serves the public interest; and (3) that the harm to be suffered by it outweighs the harm to the Government and third parties." *Hawpe Constr., Inc. v. United States*, 46 Fed. Cl. 571, 582 (2000). Based upon the administrative record and the pleadings in this matter, including the briefs of the parties, L-3 GCS has established its entitlement to injunctive relief.

### 1. Irreparable Injury

L-3 GCS will suffer irreparable injury if injunctive relief is denied because it was denied the ability to fairly compete for the contract and it will lose the profits from the contract if the injunction is not granted. *See Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99, 110 (2001)

First, ADCI will continue to perform its invalid and unlawful contract to the detriment of L-3 GCS, which was the lawful and rightful winner of the procurement. Second, L-3 GCS has been and will continue to be denied significant profits by not being able to provide satellite airtime services to the Coast Guard under the contract. This loss, by itself, satisfies the "irreparable harm" requirement of obtaining injunctive relief. *See OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 659 (2005) (finding that "a loss of potential profits stemming from a lost opportunity to compete [is] sufficient to constitute irreparable harm"); *see also Hospital Klean of Texas, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) (finding that "loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm"). Consequently, L-3 GCS will suffer irreparable harm unless this Court permanently enjoins performance of the contract.

### 2. The Balance of Hardship Weighs In Favor Of Granting Injunctive Relief

In evaluating the balance of hardships, the Court must consider whether the significant and irreparable injury that L-3 GCS will suffer, *see supra* Part J.1, outweighs the harm, if any, to the Government. *See Labat-Anderson Inc.*, 50 Fed. Cl. at 110. A failure to grant an injunction will cause harm to L-3 GCS, while generating a windfall to the wrongdoer, ADCI, and damaging the Government's interest in maintaining the integrity of the procurement process. The Agency contends that the balance of harm weighs in favor of the Government because the BPA award has been in flux. Coast Guard Brief at 27. However, the only reason for this matter being "in

flux" was the Agency's failure to take voluntary corrective action when it discovered it had made an invalid award to a non-compliant proposal. To the contrary, L-3 GCS has been the only party harmed in this case because ADCI has taken away L-3 GCS's profits by servicing the Mini-M terminals during the pendancy of this protest.

Moreover, the Government will not suffer any harm from a permanent injunction in this case. Despite the award to ADCI on December 3, 2007, the Coast Guard's attempts to transition the Fleet-55 terminals (AR 327-331 and 419) had to be cancelled on January 14, 2008 because the ADCI proposal was non-compliant and technically incompatible. *See, e.g,* AR 250. The Coast Guard then asked that L-3 GCS exert special efforts to keep the terminals running until something could be worked out to allow a takeover by the non-compliant offeror. AR 507. Up to the date of the filing of this protest, L-3 GCS not only provided continuous service for the Fleet-55 terminals, but in addition, the Coast Guard continued to add new terminals to the services being provided by L-3 GCS. *See* Myers Decl ¶ 17, AR, Tab 26. As a result, L-3 GCS is ready, willing, and able to continue to provide satellite airtime services. L-3 GCS's willingness to perform the contract is dispositive because the Government cannot claim any harm if it continues receiving comparable services. *See, e.g., Great Lakes Dredge & Dock Co. v. United States,* 60 Fed. Cl. 350, 370 (2004) (finding that the government will not suffer any harm where it "will receive precisely what it solicited, and what it still needs"). Accordingly, a balancing of the hardships requires issuance of the injunctive relief requested by L-3 GCS.

### 3. Injunctive Relief Is In The Public Interest

The public has substantial interest in maintaining the integrity of the federal procurement process. *See Advanced Sys. Tech., Inc. v. United States*, 69 Fed. Cl. 474, 486 (2006). That interest is best served "by allowing the government to proceed with contract awarded in a manner consistent with fair and open competition, to the contractor offering the best value."

*Labat-Anderson Inc. v. United States*, 50 Fed. Cl. 99, 110 (2001). Here, an injunction would serve the public interest because the Coast Guard's award to the non-compliant ADCI proposal violates several of the most fundamental principles of government contracting. *See supra* Part E. In fact, the injunctive relief requested will further the public interest by guarding against unlawful awards and by preserving the integrity of the procurement process, which is essential to maintaining public confidence in Government operations. *See Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000) (granting plaintiff's request for a permanent injunction because the public interest is best served by preserving the integrity of the competitive bid process). As such, an order permanently enjoining Defendant from permitting ADCI to begin or continue performance under the contract would serve the public interest.

**CONCLUSION**

For the reasons set forth above and in Plaintiff's Opening Brief, Plaintiff respectfully requests judgment in its favor and entry of injunctive relief. The ADCI proposal was non-compliant and ineligible for award. The award based upon the non-compliant proposal was invalid. L-3 GCS was the lowest price, technically acceptable offeror and should have received award of the contract.

Dated: July 7, 2008

Respectfully submitted,

s/ Ronald K. Henry
Ronald K. Henry
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005
Phone: (202) 682-3500
Fax: (202) 682-3580
*rhenry@kayescholer.com*

*Attorney for L-3 Global Communications Solutions, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was electronically filed on July 7, 2008, with the Clerk of the Court for the United States Court of Federal Claims via the CM/ECF system. This system will send electronic notice of filing to the following individuals:

Dawn S. Conrad
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
Attn: Classification Unit, 8th Floor
100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-2279
Fax: (202) 305-7643

*Attorney for Defendant*

s/ Ronald K. Henry
Ronald K. Henry
KAYE SCHOLER LLP
The McPherson Building
901 Fifteenth Street, NW
Washington, DC 20005
Phone: (202) 682-3500
Fax: (202) 682-3580
*rhenry@kayescholer.com*

*Attorney for L-3 Global Communications Solutions, Inc.*