# In the United States Court of Federal Claims

No. 08-101 C
(Filed August 15, 2008)[1]

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * | * | |
| L-3 GLOBAL COMMUNICATIONS SOLUTIONS, INC., | * | Post-Award Bid Protest; |
| | * | Responsiveness Depends on a |
| | * | Bid's Facial Compliance with |
| | * | Material Requirements of the |
| *Plaintiff,* | * | Solicitation; Elements of Proof |
| | * | for a "Bait and Switch" |
| v. | * | Challenge; Awardee's Rejected |
| | * | Proposal for Post-Award |
| THE UNITED STATES, | * | Contract Modification Does Not |
| | * | Invalidate Award. |
| *Defendant.* | * | |
| * * * * * * * * * * * * * * * * | * | |

*Ronald K. Henry*, Washington, DC, for plaintiff.

*Dawn S. Conrad*, United States Department of Justice, with whom were *Gregory G. Katsas*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Deborah A. Bynum*, Assistant Director, Washington, DC, for defendant. *Talbot J. Nicholas II*, United States Coast Guard, Washington, DC, of counsel.

---

## OPINION

---

**Bush**, *Judge*.

This post-award bid protest is before the court on cross-motions for judgment on the administrative record filed under Rule 52.1(b) of the Rules of the United States Court of Federal Claims (RCFC). L-3 Global Communications

---

[1]/ This opinion was issued under seal on August 5, 2008. Pursuant to ¶ 4 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Brackets ([ ]) identify the material deleted.

Solutions, Inc. (Global) challenges the award by the United States Department of Homeland Security, United States Coast Guard (Coast Guard or USCG) of contract number HSCG23-08-A-TMM001 (contract) to ADCI of Delaware, LLC (ADCI). The contract is a blanket purchase agreement (BPA), procuring satellite airtime and billing services for maritime communication terminals. Global seeks a declaration that the Coast Guard's award of the contract to ADCI was contrary to applicable procurement law and regulations, and requests a permanent injunction of the award to ADCI. Compl. at 1.

Global filed its post-award bid protest complaint on February 22, 2008. An administrative record (AR) was filed on March 3, 2008, and was supplemented on March 12, 2008, April 14, 2008, and April 29, 2008. The parties' cross-motions have been fully briefed, and oral argument was held on July 30, 2008. For the reasons discussed below, defendant's motion is granted, and the award of the contract to ADCI is upheld.

## BACKGROUND

The Coast Guard described this acquisition as being "similar to contracting with a long distance or cell phone provider whose services are not commonly sold in the commercial marketplace as performance based." AR at 17. Through the contract awarded here, the USCG sought to maintain communications with its Coast Guard cutters through International Maritime Satellite (INMARSAT) terminals on those ships. *Id.* at 55. The successful offeror would provide "airtime and billing services" for at least two types of terminals already in operation on the cutters, Mini-M and Fleet-55 terminals. *Id.* Global was the incumbent contractor providing airtime and billing services for the Fleet-55 terminals. *Id.* at 116. ADCI was the incumbent contractor for the Mini-M terminals' airtime and billing services. *Id.* at 100. Thus, the awardee would provide services formerly delivered by two contractors.

The Coast Guard solicited bids for a five-year BPA "under the General Services Administration (GSA) Federal Supply Schedule (FSS) 70 Contract." AR at 53. A substantial portion of the solicitation (RFQ) was devoted to five price schedules, one for each of the one-year ordering periods. *Id.* at 58-62. On each schedule were listed the categories of communication services required and estimated usage figures, next to which were blanks for the offeror's proposed billing rates per minute or megabit, and for the offeror's total price for that

communication service category for that year. *Id.* The Coast Guard's usage estimates were substantially revised after they were questioned, *id.* at 82-86, and all bidders submitted revised price schedules, *id.* at 108-12, 143-47, 447-51. Aside from the price schedules, only two other items were required in each proposal: "(b) A statement of compliance that the contractor can meet all services prescribed in this RFQ [and] (c) Any other relevant information to include exceptions/assumptions related to this RFQ." *Id.* at 53. "[A]ward [would be] to the responsible vendor deemed technically acceptable with the lowest quoted price determined to be fair and reasonable." *Id.* at 53-54.

Although the RFQ included a statement of work, questions concerning the BPA arose and were submitted to the Coast Guard by the bidders. AR at 89-93. These questions, and the answers thereto, were attached to and modified the RFQ. *Id.* at 73-80. For this protest, the most important aspect of the BPA that was clarified through these questions was the fact that the awardee was required to continue using the same company as Land Earth Station Operator (LESO) for the cutters' INMARSAT communications.[2] *Id.* at 90. The successful offeror, instead of selecting any LESO in the marketplace, would necessarily perform the contract using a company named Stratos as the terrestrial receiver for INMARSAT communications. *Id.* at 92. Two of the bids received by the Coast Guard explicitly mentioned that Stratos' LESO services were being offered for the five-year BPA. *Id.* at 120, 426. ADCI's bid was silent on this topic, and included only a general statement that [ ].[3] *Id.* at 107.

All of the three proposals received were rated technically acceptable. AR at 183. All of the three bids received were far below the Coast Guard's estimate of [ ], and this "sizable discrepancy" was attributed to the "conservative" price estimates that had been generated for planning purposes. *Id.* at 182-83. The Coast Guard determined that the three bids were "fair and reasonable" in price. *Id.* at 183. ADCI had the lowest bid, at $28,940,576.25. *Id.* at 182. Global had the next lowest bid, at [ ]. *Id.* Thus, ADCI's bid was [ ] lower than Global's bid, and ADCI won the contract.

---

[2]/ According to defendant, the LESO receives and relays communications sent from a cutter via satellite. Def.'s Mot. at 5 n.5.

[3]/ ADCI's bid mentioned its incumbent experience using Stratos for communications from the Mini-M terminals. AR at 107.

The Coast Guard issued the original version of the RFQ on October 22, 2007, required questions to be submitted by October 24, 2007, and set a bid deadline of October 29, 2007. AR at 53-54. The original solicitation contemplated an ordering period starting November 1, 2007, *id.* at 53, and a kick-off meeting no later than five business days after award, *id.* at 56. This ambitious schedule was delayed first by the solicitation amendments, so that final bids, including revised price quotes, were not due until November 30, 2007. *Id.* at 81. Award to ADCI was made on November 30, 2007, with the ordering period for the BPA to begin on that date. *Id.* at 186, 191.

The first task order under the BPA was issued on December 1, 2007. AR at 209. The transition from two contractors to a single contractor did not go smoothly, however. Global, the incumbent contractor losing its role as the Fleet-55 airtime and billing services contractor, asked for a debriefing on December 5, 2007. *Id.* at 214-15. Sometime around December 11, 2007, the Coast Guard began shifting a number of terminals on cutters to ADCI's airtime and billing services. *Id.* at 327-32. At a debriefing on December 20, 2007, Global made it clear that it suspected ADCI of undercutting its price by using another LESO, not Stratos. *Id.* TAB 26 at 2-3. In the middle of January 2008, the transition of Fleet-55 airtime and billing services to ADCI faltered. *See, e.g.*, AR at 342; Def.'s Mot. at 7 (noting that "the transition of Fleet 55 terminals to ADCI was either halted or transitioned back to [the prior] management"); Pl.'s Reply at 18-19 (stating that only three Fleet-55 terminals were transferred to ADCI services, and these three only briefly remained with ADCI before getting transferred back to Global); Def.'s Reply at 8 n.7 (suggesting that the correct number of Fleet-55 terminals temporarily using ADCI's airtime and billing services was five, not three).

The record shows that by January 4, 2008, ADCI had contacted the Coast Guard to propose rerouting Coast Guard satellite communications away from the LESO services provided by Stratos to those provided by another LESO, Telecom Italia. AR at 334. This proposed change in LESO appears to have caught Coast Guard personnel by surprise; nonetheless, the USCG response in the first few days of January was to try to accommodate ADCI's instructions to have the Fleet-55 terminals on the cutters reprogrammed to reach Telecom Italia. *Id.* at 336 (comment from one Coast Guard officer: "Nice to see this 'after the contract is awarded' information coming out of the woodwork!"). However, some Coast Guard personnel raised concerns, primarily technical, not contractual, that switching from Stratos might not be practical or cost-effective in the long run. *See,*

*e.g.*, *id.* at 338, 342, 350-51, 361. On the other hand, communications from ADCI apparently stressed the importance of the change to Telecom Italia. *Id.* at 350 (email from a USCG officer noting that "since we are not going to be using Telecom[] Italia, ADCI cannot meet the price listed in the contract"). Also in January, USCG personnel realized that there might be restrictions on the LESO switch in the terms of the RFQ itself, as modified by the Coast Guard's answers to questions from bidders. *Id.* at 349. By January 17, 2008, Global had been informed that the transition of the Fleet-55 terminals to ADCI's services had been halted. *Id.* at 342, 359.

Although the decision-making process of the Coast Guard is not crystal clear from the record, by early February USCG personnel were reviewing both the technical and contractual implications of ADCI's proposal to switch from Stratos to Telecom Italia. AR at 387, 396, 398. By the middle of February, the Coast Guard was circulating a draft response to ADCI's proposal. *Id.* at 400-05. USCG personnel contacted Stratos to inquire whether Stratos would permit Telecom Italia to use its facilities, but Stratos indicated that it would refuse any such request from ADCI or Telecom Italia. *Id.* at 414. On February 27, 2008, the USCG contracting officer informed ADCI that a change of LESO would not be acceptable to the Coast Guard. *Id.* at 302. By February 29, 2008, ADCI had abandoned its proposal to substitute Telecom Italia for Stratos as the LESO for its contract services. *Id.* at 302, 421, 424i.

Once Global filed its protest in this court on February 22, 2008, the Coast Guard agreed to maintain the status quo whereby Global continued to provide services for the Fleet-55 terminals. Both ADCI and Global are now providing satellite airtime and billing services to Coast Guard cutters. The parties agreed to resolve this protest on the merits rather than seeking an accelerated decision from the court.

Plaintiff has briefed four main arguments in this post-award bid protest. First, Global asserts that ADCI's proposal was ineligible for award. Second, Global contends that the Coast Guard's evaluation of ADCI's proposal was improper. Third, plaintiff argues that Global did not receive equal and fair treatment in the award process. Fourth, plaintiff argues that post-award actions by the Coast Guard violated procurement law and regulations. The court finds, however, that because ADCI was unsuccessful in persuading the Coast Guard to

allow ADCI to use a LESO other than the one specified in the RFQ, no violation of procurement law or applicable regulations has occurred.

## DISCUSSION

### I. Jurisdiction

The Tucker Act provides the United States Court of Federal Claims with bid protest jurisdiction. 28 U.S.C.A. § 1491(b)(1)-(5) (West 2006 & Supp. 2008); *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1300 (Fed. Cir. 2001) (*AFGE*); *Hunt Bldg. Co. v. United States*, 61 Fed. Cl. 243, 268-69 (2004). The statute explicitly provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). The statute also states that the Court of Federal Claims "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.* Accordingly, this court has subject matter jurisdiction to entertain this bid protest, unless some other impediment to jurisdiction prevents consideration of plaintiff's suit.

### II. Standards of Review

#### A. Judgment on the Administrative Record

RCFC 52.1(b) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(b), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The court must make fact findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

#### B. Bid Protest Review

As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United*

*States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*). This may be accomplished by demonstrating that the plaintiff was an actual bidder and that it was prejudiced by the award to the successful offeror. *Id.* (citing *AFGE*, 258 F.3d at 1302). Prejudice is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).[4] Standing is an element of this court's jurisdiction over bid protest cases. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006) (upholding a dismissal for lack of jurisdiction because the protestor was not an actual bidder on the disputed contract and could not show prejudice, *i.e.*, that it had a substantial chance of receiving the contract but for the alleged procurement errors).

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (*Banknote*) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)); *see also* 28 U.S.C. § 1491(b)(4) (describing this court's standard of review for bid protests). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). *De minimis* errors in the procurement process, however, do not

---

[4]/ This first showing of prejudice to the protestor, in order to prove standing, must occur before reaching the merits of the bid protest review. *See ITAC*, 316 F.3d at 1319 (stating that "because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits"). The Federal Circuit has also stated that the two-step review of contract awards begins with a "without rational basis or contrary to law" review of an award and then proceeds to the issue of prejudice to the protestor. *Bannum*, 404 F.3d at 1351. This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief. *See Textron, Inc. v. United States*, 74 Fed. Cl. 277, 284 (2006) (noting that "in addition to [prejudice] being an element of standing, a showing of prejudice is required before injunctive relief is granted") (citations omitted); *Night Vision Corp. v. United States*, 68 Fed. Cl. 368, 392 & n.23 (2005) (characterizing the prejudice determination for standing purposes as a "limited review for prejudice," seeking "minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing").

justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the bid process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III. Standing

The award here was made to the lowest-priced technically acceptable proposal. AR at 53-54, 184. After ADCI, Global had the next lowest price and was rated technically acceptable. *Id.* at 182. But for the procurement errors alleged by plaintiff to have unjustly allowed award to ADCI, Global had a substantial chance of winning this contract. Global therefore has standing to bring this protest. *ITAC*, 316 F.3d at 1319 (citation omitted).

## IV. Whether the Award to ADCI was Arbitrary or Capricious or Contrary to Law

### A. Was ADCI's Proposal Ineligible for Award?

Global contends that ADCI's bid was noncompliant with the requirements of the RFQ. Pl.'s Mem. at 2. Plaintiff correctly cites the principle that award to a bidder whose proposal is materially noncompliant with a solicitation's requirements is improper. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996) (noting that "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations" (internal quotations and citations omitted)). But the test for noncompliance is generally a test of facial noncompliance, not a test as to whether the subjective, undisclosed intent of an offeror is noncompliant with the solicitation's requirements. *See id.* at 449 (upholding a contract award because the protestor did not show that the government "acted arbitrarily and capriciously in awarding the contract on the basis of its belief that [the awardee's] proposal included a [required item]").

There was no requirement in the solicitation that ADCI note or describe its contemplated LESO, and ADCI chose not to do so. If, as it now appears, ADCI priced its bid assuming that the Coast Guard would allow it to use Telecom Italia as a LESO, that assumption was not apparent on the face of its bid. ADCI's compliance with the requirement that Stratos remain the LESO for the cutters' INMARSAT communications is a matter of contract administration, or contractor responsibility, not a matter of the responsiveness of ADCI's bid.[5] *See SecureNet Co. v. United States*, 72 Fed. Cl. 800, 810 (2006) (noting that when a contractor's "violation of [a contract requirement] would not be apparent until actual contract performance," the government had no duty to evaluate whether the contractor's proposal had taken exception to that requirement); *see also Radio TV Reports, Inc.*, B-192958, 79-2 CPD ¶ 27 (Comp. Gen. July 12, 1979) (denying protest despite post-award allegations that the awardee did not intend to perform contract as stated in its bid, because such concerns relate to the contractor's responsibility, not to the responsiveness of the bid); *E. Brokers, Inc. & Jan Pro Corp.*, B-193774, 79-1 CPD ¶ 75 (Comp. Gen. Jan. 31, 1979) (denying protest despite allegations of a below-cost winning bid and concerns that the awardee's contract performance would be substandard, because these issues relate to the contractor's responsibility or

---

[5]/ "Responsiveness refers to the question of whether a bidder has promised to perform in the precise manner requested by the government." *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226 (1990) (citations omitted). "Responsibility, by contrast, involves an inquiry into the bidder's ability and will to perform the subject contract as promised." *Id.* (citation omitted).

contract administration, not to the responsiveness of the winning bid). As the Government Accountability Office (GAO) has stated:

> We [the GAO] have held on numerous occasions that the test to be applied in determining the responsiveness of a bid is whether the bid as submitted is an offer to perform, without exception, the exact thing called for in the invitation, and upon acceptance will bind the contractor to perform in accordance with all the terms and conditions thereof. Unless something on the face of the bid, or specifically a part thereof, either limits, reduces or modifies the obligation of the prospective contractor to perform in accordance with the terms of the invitation, it is responsive.

*To Eugene Drexler*, 49 Comp. Gen. 553, B-168518, 1970 CPD ¶ 21 (Comp. Gen. Mar. 10, 1970) (citations omitted). Because ADCI's proposal was facially compliant with every solicitation requirement, and its price was determined to be reasonable and the lowest of the three bids received, ADCI's proposal was eligible for award.

Plaintiff relies on numerous GAO decisions which have sustained protests because an awardee tardily offered to correct a noncompliant bid after award. *See* Pl.'s Reply at 24. However, each of the winning bids discussed in these cases was noncompliant on its face. *See Universal Yacht Servs., Inc.*, B-287071, B-287071.2, 2001 CPD ¶ 74 (Comp. Gen. Apr. 4, 2001) (sustaining protest because awardee's proposal did not promise required performance and the resulting contract waived the solicitation requirement that the awardee had not promised to deliver); *Tri-State Gov't Servs., Inc.*, B-277315, B-277315.2, 97-2 CPD ¶ 143 (Comp. Gen. Oct. 15, 1997) (sustaining protest where awardee had submitted a price schedule which did not conform to the format required by the solicitation, thus reaping an advantage not allowed other offerors); *Multi-Spec Prods. Group Corp.*, B-245156, B-245156.2, 92-1 CPD ¶ 171 (Comp. Gen. Feb. 11, 1992) (sustaining protest where awardee had deleted certain material solicitation specifications in its proposal but was nonetheless awarded contract); *Martin Marietta Corp.*, 69 Comp. Gen. 168, B-233742, B-233742.4, 90-1 CPD ¶ 132 (Jan. 31, 1990) (sustaining protest because "[t]he specification required offerors to select hardware and software on the basis that requirements had to be met at the time of award" and the

awardee's proposed hardware and software did not comply with a material requirement of the solicitation). None of these decisions addressed a facially compliant bid where the awardee was alleged to have had a noncompliant intent. The authorities cited by plaintiff are inapposite,[6] and the court found no authority to support plaintiff's argument that a facially compliant bid must be rejected as nonresponsive in the event that post-award contract modifications are proposed by the awardee.[7]

In plaintiff's reply brief, Global points out another reason why ADCI's bid was allegedly noncompliant with the solicitation: "ADCI did not comply with the requirement to reveal its exceptions and assumptions in connection with its proposal to utilize Telecom Italia for the Fleet-55 terminals." Pl.'s Reply at 9. However, as the court has previously discussed, judicial review of the contract award focuses on whether the award was supported by facial compliance of the winning bid with the requirements of the solicitation. *See, e.g.*, *Blount, Inc. v. United States*, 22 Cl. Ct. 221, 226 (1990) ("Matters of bid responsiveness must be discerned solely by reference to the materials submitted with the bid and facts available to the government at the time of bid opening."). Here, the government could not divine that ADCI had neglected to list its exceptions and assumptions, if any, regarding Telecom Italia. By not listing any assumptions regarding Telecom Italia, ADCI's bid was facially compliant with all material requirements of the solicitation.

Even if, as plaintiff alleges, ADCI's bid was not compliant with the solicitation requirement demanding the submission of "[a]ny other relevant information to include exceptions/assumptions related to this RFQ," AR at 53, the court does not regard this requirement as a *material* solicitation requirement in this instance. *See Blount*, 22 Cl. Ct. at 227 ("Material terms and conditions of a solicitation involve price, quality, quantity, and delivery.") (citation omitted). ADCI's proposal affirmed that ADCI [ ]. AR at 100, 107. ADCI agreed to perform all solicitation requirements without exception, including using Stratos as the LESO for contract services. *Id.* at 424i. Thus, all material terms of the

---

[6]/ Plaintiff offered references to additional GAO decisions at oral argument, *see infra* notes 8-10 and accompanying text.

[7]/ *See infra* Section IV-D of this opinion for a review of decisions in protests challenging post-award conduct of an awardee.

solicitation affecting price and delivery of services have been complied with by ADCI. The court finds that ADCI's bid was compliant with all material aspects of the solicitation, and was eligible for award.

At oral argument, plaintiff's counsel cited for the first time to over a dozen GAO decisions which, in plaintiff's view, hold that proposals, despite being facially compliant with a solicitation's requirements, must nonetheless be rejected by the government as noncompliant for reasons of ambiguity, insufficient detail, later discovery of the undisclosed noncompliant intent of the offeror, or for otherwise failing to bind the offeror to a contract in accordance with the solicitation's requirements. Defendant's argument that ADCI's proposal was facially compliant with the solicitation, and that award to ADCI was therefore unassailable, was presented in its moving brief. *See* Def.'s Mot. at 13-16. Plaintiff responded to defendant's argument in its response/reply brief, and cited to numerous GAO decisions, discussed *supra*, in support of its position that later-discovered "noncompliance" of a winning proposal should invalidate a contract award. *See* Pl.'s Reply at 21-25. Plaintiff sought to supplement those authorities at oral argument by attempting to orally file what is, in the court's view, an improper sur-reply; plaintiff's only justification was counsel's vague reference to the existence of new, yet unidentified, arguments in defendant's reply brief. Defendant would be prejudiced by plaintiff's proposed filing, because defendant's counsel was understandably unable to respond at oral argument to fourteen GAO decisions that were neither discussed nor cited in plaintiff's briefs.[8]

The court denies plaintiff's request to consider these additional authorities, because such a use of oral argument abuses the adversarial process. The citations offered by plaintiff are not simply citations to additional authority for arguments already advanced – these decisions encompass new theories and arguments. For example, two of the decisions relied upon by plaintiff at oral argument suggest that post-award negotiations between an awardee and the government may, in certain circumstances, constitute illegal discussions under 10 U.S.C. § 2305(b)(4)

---

[8]/ The court would also be inconvenienced, because the briefing of this bid protest closed on July 17, 2008, the filing deadline for defendant's reply brief, not on July 30, 2008. Plaintiff's attempted filing at this late date of what is, in essence, a sur-reply would, if allowed, disrupt the court's management of its docket.

[(2006)].[9] *See Fed. Data Corp.*, 69 Comp. Gen. 150, B-236265, B-236265.2, 90-1 CPD ¶ 104 (Comp. Gen. Jan. 25, 1990); *Dresser-Rand Co.*, B-237342, 90-1 CPD ¶ 179 (Comp. Gen. Feb. 12, 1990). This argument, and this statute, were never argued by plaintiff to provide reasons for sustaining this bid protest. Plaintiff must not be allowed to advance new legal theories at oral argument, prejudicing defendant. *See Arakaki v. United States*, 62 Fed. Cl. 244, 246 n.9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete.") (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *Res. Recycling Corp. v. United States*, 56 Fed. Cl. 612, 618 (2003) (noting that "courts are rightfully loathe to allow a party to raise an issue at oral argument for the first time because there is a lack of notice to the court and adversary") (citing *Cubic Def. Sys. v. United States*, 45 Fed. Cl. 450, 466-68 (1999)). Plaintiff waived any right to advance arguments it had not briefed prior to oral argument.[10] *See Cubic*, 45 Fed. Cl. at 467 (ruling that arguments presented for the first time at oral argument were "out of order").

### B. Did the Coast Guard's Evaluation of ADCI's Proposal Violate Procurement Regulations?

Plaintiff's second argument does not stray far from the first. Global asserts that the Coast Guard waived a material requirement of the solicitation for ADCI's benefit when it approved ADCI's bid. Pl.'s Mem. at 20. As discussed previously, ADCI's offer did not indicate that ADCI planned to use a LESO other than Stratos. Thus, there was no waiver of a material requirement of the solicitation at the time of contract award.[11]

---

9/ The court selected these two decisions, in particular, because plaintiff relied on them both during its opening argument, and during its rebuttal time.

10/ The court notes that GAO decisions are not binding on this court. Plaintiff also cited to *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003), and *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720 (2003), for the first time during oral argument, for their holdings regarding contract formation. Neither of these authorities compels the conclusion, advanced by plaintiff, that a bid must be rejected as noncompliant, despite being facially responsive to all solicitation requirements, if it is later discovered that the bidder's intent was to not comply with all solicitation requirements.

11/ Plaintiff also asserts that post-award conduct by the Coast Guard relaxed, modified or (continued...)

### C. Did the Coast Guard Treat Bidders Equally and Fairly?

Plaintiff argues that by neglecting to disqualify ADCI "for its failure to designate Stratos as the exclusive airtime services provider[,] . . . the Coast Guard failed to treat offerors equally." Pl.'s Mem. at 21. Again, this argument founders because all three bids were facially compliant with the solicitation's requirements, and all bids were judged to be technically acceptable. Thus, all bidders received equal treatment.

None of the cases upon which plaintiff relies suggests that a facially compliant bid must be rejected by the government simply because the bidder has made an undisclosed, inaccurate assumption in the pricing of its bid. It is true that ADCI appears to have, either knowingly or unknowingly, based its bid on a business plan that ignored the requirement that the awardee continue to use Stratos as the LESO for contract services. There is no indication in the record, however, that the Coast Guard knew or should have known of this fact. The Coast Guard determined that ADCI's price was fair and reasonable, and Global has alleged no flaws in the Coast Guard's price evaluation. The court finds that the Coast Guard treated all bidders equally and fairly, in compliance with applicable procurement laws and regulations.

### D. Are Post-Award Actions by the Coast Guard Indicative of Violations of Procurement Law and Regulations?

Finally, plaintiff argues that the Coast Guard should have canceled the contract rather than proceeding to "acquiesce[] and assist[] in implementing ADCI's non-compliant and technically unacceptable proposal." Pl.'s Mem. at 22. This type of allegedly invalid contract award is often referred to as a "bait and switch." *See* Compl. ¶ 45 (alleging that ADCI was either "conducting a 'bait and switch,' or failed to realize that the Solicitation required the exclusive use of Stratos airtime services"). Many of the cases discussing "bait and switch" contract awards, including cases cited by plaintiff, involve winning bids promising key, skilled personnel, who never actually perform the awarded contract services required by the solicitation. *See, e.g.*, *Planning Research Corp. v. United States*,

---

[11](...continued)
waived material requirements of the solicitation. The court addresses this contention *infra*, in Section IV-D of this opinion.

971 F.2d 736 (Fed. Cir. 1992); *Low & Assocs., Inc.*, B-297444.2, 2006 CPD ¶ 76 (Comp. Gen. Apr. 13, 2006). However, one common element to decisions invalidating contract awards involving a "bait and switch" is that a "switch" must have occurred and the "switch" must have been accepted by the government agency procuring the services. *See, e.g.*, *Planning Research*, 971 F.2d at 740-41 (affirming a decision invalidating an award where there had been "'massive' personnel substitutions made by [the awardee] after award with the acquiescence and assistance of [the government agency]"); *Low and Associates*, B-297444.2, 2006 CPD ¶ 76 (sustaining a protest where "none of the personnel [the awardee] proposed to perform either of the two web page designer/developer positions has ever performed on-site"). In this case, there is no evidence that ADCI was able to successfully switch to Telecom Italia as the LESO for the contract services, or that the Coast Guard acquiesced to a switch to Telecom Italia. *See* Def.'s Mot. at 18 (noting that the USCG "never permitted ADCI to use Telecom Italia as the LESO"); *see also* Pl.'s Mem. at 15 (noting "the failure of this last-ditch effort to implement the non-compliant proposal"). For this reason, the court rejects plaintiff's argument that the award to ADCI was later invalidated by the conduct of ADCI and the Coast Guard.

The record shows that ADCI attempted a switch of LESO and failed to convince the Coast Guard that the switch should be implemented. The caselaw governing "bait and switch" protests in the personnel substitution context requires a showing of the following four elements:

> (1) the awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing the services.

*Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 64 (2000) (citations omitted). Thus, the fourth element of proof in a "bait and switch" case is that an actual "switch" has occurred. *See Prot. Strategies, Inc. v. United States*, 76 Fed. Cl. 225, 235 (2007) (ruling that a protestor had failed to show that a contract award was unlawful because, among other reasons, no actual "switch" had occurred). Here, there is no evidence that Telecom Italia was used as a LESO by

ADCI in its performance of contract services. Because no "switch" occurred, this protest cannot be sustained.

As defendant points out, there is another test for unlawful post-award conduct by an awardee and a government agency which could invalidate a contract award. Def.'s Mot. at 19-22. Procurement law generally forbids modifying a contract after award so as to deprive the losing bidders of their chance to compete for what is essentially, after the modification, a new contract. *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1204-05 (Fed. Cir. 1993) (citing 41 U.S.C. § 253(a)(1)(A) [(2000)]). This doctrine is limited to "modifications outside the scope of the original competed contract." *Id.* at 1205. Here, there has been *no* substantive modification of the contract performed by ADCI, only a suggested modification that was rejected by the Coast Guard.[12] This court cannot overturn a contract award where an attempted but unrealized contract modification is the only alleged procurement error. *See GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 782-83 (1997) (requiring proof of an actual contract modification to sustain a bid protest on these grounds).

Plaintiff emphasizes the fact that the Coast Guard considered ADCI's proposed switch of LESO and did not immediately reject the idea. *See* Pl.'s Mem. at 7-16. Plaintiff suggests that this conduct constitutes "unlawfulness of the highest order." *Id.* at 15. Plaintiff suggests that "[r]ather than struggle to assist ADCI in implementing the non-compliant proposal, with all of its technical problems, the Contracting Officer should have canceled the award."[13] Pl.'s Reply

---

[12]/ At oral argument, plaintiff suggested that the Coast Guard's delay in implementing the transition of Fleet-55 terminals to ADCI constituted an improper contract modification. Defendant responded that this halting of the transition, and the return of a few Fleet-55 terminals to Global's services, was not a contract modification but an attempt to maintain the *status quo* while the Coast Guard considered ADCI's proposal to switch from Stratos to Telecom Italia. The court agrees with defendant that the delayed transition of the Fleet-55 terminals to ADCI's management did not effect a contract modification, but merely allowed the Coast Guard adequate time to consider its proper course of action. *See infra* note 14.

[13]/ The case plaintiff cites for this proposition merely states that a contracting officer may, not must, cancel an award after the discovery of an "impropriety" on the part of the winning bidder. *See PPATHI, Inc.*, B-249182, B-249182.4, 93-1 CPD ¶ 64 (Comp. Gen. Jan. 26, 1993). The facts in *PPATHI* are distinguishable, and, in any case, do not support plaintiff's

(continued...)

at 11. Because the record indicates that ADCI has used and will continue to use Stratos as the LESO for contract services, ADCI's performance of the contract does not indicate that the Coast Guard has illegally relaxed solicitation requirements in its dealings with ADCI. If, indeed, the Coast Guard violated procurement regulations by investigating the proposal by ADCI for approximately two months, the court considers this conduct to be a *de minimis* violation that does not invalidate the contract award.[14]

## V. Whether Global was Prejudiced by the Award to ADCI and Should be Awarded Injunctive Relief

Because plaintiff has not succeeded on the merits of this bid protest, the court need not consider whether Global was prejudiced by the award to ADCI, or whether the standard for injunctive relief has been met in this case.

## CONCLUSION

Plaintiff has not shown that the award of contract number HSCG23-08-A-TMM001 to ADCI was arbitrary or capricious or contrary to law. For these reasons, plaintiff's bid protest cannot be sustained.

Accordingly, it is hereby **ORDERED** that

---

[13](...continued)
overarching argument that the Coast Guard had no option other than cancelling the contract upon learning of ADCI's request to switch from Stratos to Telecom Italia. *See* Pl.'s Mem. at 22 ("The Coast Guard had an obligation to reject ADCI's proposal after discovering that the proposal was technically unacceptable.").

[14]/ The court views the two-month period of time between the submission of ADCI's proposed contract modification on or about January 4, 2008 and its rejection on February 27, 2008 to be within the scope of the discretion of the government in administering its contracts. *See Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 467 (2001) (noting that protests alleging post-award modifications of a contract may "bring the court perilously close to engaging in outright contract administration [and cautioning that] [i]t is within the prerogative of the parties to make continuous efforts to comply with the requirements of a solicitation and contract when problems arise") (citation omitted).

(1) Plaintiff's Motion for Judgment on the Administrative Record, filed May 23, 2008, is **DENIED**;

(2) Defendant's Cross-Motion for Judgment on the Administrative Record, filed June 16, 2008, is **GRANTED**;

(3) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, **DISMISSING** the complaint, with prejudice;

(4) On or before **September 8, 2008**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5) Each party shall bear its own costs.

/s/Lynn J. Bush
LYNN J. BUSH
Judge